# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RONALD TRI TRAN,
Defendant and Appellant.

S165998

Orange County Superior Court
01HF0193

August 29, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Guerrero concurred.

Opinion of the Court by Liu, J.

A jury convicted defendant Ronald Tri Tran of first degree murder for the killing of Linda Park. (Pen. Code, § 187, subd. (a); all statutory references are to the Penal Code unless otherwise specified.) The jury found true the special circumstances of robbery murder (§ 190.2, subd. (a)(17)(A)), burglary murder (§ 190.2, subd. (a)(17)(G)), and torture murder (§ 190.2, subd. (a)(18)). It also found true the enhancement that Tran committed the murder for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) Following the penalty phase, the jury returned a verdict of death on November 5, 2007. The trial court denied Tran's motions for a new trial and for reduced punishment, denied the automatic motion to modify the verdict (§ 190.4, subd. (e)), and sentenced Tran to death.

This appeal is automatic. (§ 1239, subd. (b).) We strike the gang enhancement but otherwise affirm the judgment.

## I.   FACTUAL BACKGROUND

Tran was tried jointly with Noel Plata. Both were sentenced to death. Plata died on December 14, 2020, and we ordered proceedings as to Plata abated, so we confine our review to Tran's claims only.

1

**A. Guilt Phase**

    *1. Prosecution Case*

    a.   The November 9, 1995, Robbery of the Park Residence and Linda's Death

    In November 1995, Linda Park lived in Irvine with her family: Sunhwa Park, her father; Dong Park, her mother; and Janie Park, her older sister. Sunwha typically worked from about 6:00 or 7:00 a.m. to about 8:00 p.m., while Dong typically worked from about 4:00 p.m. to about 10:00 p.m. On November 9, 1995, Sunhwa spoke to Linda by telephone around 5:00 p.m. to tell her that he would be home for dinner around 8:00 p.m.

    After Linda spoke with Sunhwa, she spoke with Danny Son, her classmate, by telephone between 6:00 p.m. to 7:00 p.m. That evening, Linda was recording a greeting on Son's pager when someone arrived at the front door of the Park home. Son testified that Linda told him to wait and that she put her phone down. Linda seemed to be speaking to someone, Son recalled, but he could not make out their voice, only hers. Son testified that he heard Linda say, "What's wrong? What's your problem? You need help?" Son thought that Linda might be speaking to her sister, decided to hang up, and called her back about 30 minutes later, though only reached an answering machine.

    Around 8:05 p.m., Sunhwa returned home. He noticed that the front door was already unlocked and, upon entering the home, discovered Linda in the living room. Linda was lying prone with her hands and feet tied behind her, Sunhwa testified. Sunhwa tried to call 911 but could not locate the telephone, so he eventually ran to the home of his neighbor, Marilyn Fox, and she called 911.

Law enforcement officers arrived soon after. One officer, Rolf Parkes, discovered Linda lying prone in the living room and observed that her ankles and wrists were bound behind her back with a nylonesque cord, that a grey electrical cord was wrapped around her neck and connected to the nylonesque cord, and that her vital signs were negative.

b.      Crime Scene and Forensic Evidence

Sunhwa testified about valuables that were kept in their home. He testified that he typically stored cash in a brown jacket that was stored in a closet in their master bedroom. Janie and Linda knew where the jacket was kept, and Sunhwa allowed them to retrieve cash from it as needed. On November 9, 1995, Sunhwa said he had stored about $700 to $800 in this jacket. Sunhwa also explained how his wife, Dong, typically stored her jewelry inside boxes in the drawer of her makeup table in the master bedroom, including on November 9, 1995. Sunhwa also testified about his actions after he discovered Linda's body that evening. He ran to the master bedroom, where he noticed his brown jacket on the closet floor.

Parkes retrieved this jacket later and confirmed with Sunhwa that it was the jacket that typically contained money. There was no money in the jacket when he found it, Parkes testified. Parkes also explained how he observed two jewelry boxes atop a coffee table in the living room where Linda was found. An empty tray that looked like it belonged in one jewelry box was also on this table. And another living room table had various plants placed atop it, including a potted cactus that was lying on its side. Parkes also testified that the rest of the home was in a "very orderly, almost emaculate [*sic*] condition," without evidence of ransacking, including in the master

bedroom. Nor was there evidence of a forced entry into the home.

David Stoermer, a crime-scene investigator for the Irvine Police Department, testified about various items in the Park home and the attempt to collect fingerprints from it. He testified that the electrical cord around Linda's neck had a thermostat device on it and that the cord had been cut on one end with scissors or a knife. An empty heating pad box was found in the TV room. This box displayed a picture of a heating pad and an attached electrical cord that looked like the cord around Linda's neck, Stoermer testified. Yet no heating pad was found in the home or in the garage. The twine with which Linda was bound was not found in the home, there was no duct tape found there either, and a pair of scissors and Linda's pager were missing from there too. Nor were any fingerprints recovered, including from places like door-jambs and handles as well as from the jewelry boxes found atop the coffee table.

Mary Hong, a forensic scientist with the Orange County Sheriff's Department, testified about DNA analysis that she had performed for this case. She tested the electrical cord found on Linda's neck and did not discover any DNA relating to Tran or Plata. Yet a portion of the twine that was used to bind Linda showed a mixture of DNA from at least three people that was consistent with Linda and Tran being contributors.

c.      Linda's Autopsy

Dr. Richard Fukumoto, a pathologist, testified that an autopsy showed that Linda died by asphyxiation due to ligature strangulation. The electrical cord was wrapped twice around her neck. Among other injuries, Linda had indentations, abrasions, and contusions on her neck, wrists, and feet;

hemorrhaging and a bruise on her left cheek below her eye; and two overlapping slash wounds on her neck. The injuries on her left cheek, Fukumoto testified, could have been caused by a fist, the palm of a hand, or the back of a hand. The injuries on her wrists indicated that Linda tried to escape the binding, Fukumoto continued. And the slash wounds could have been caused by a knife or scissors and were not deep enough to kill Linda immediately, though would have done so eventually. Fukumoto testified that the facial injuries, the slash wounds, and the binding would have happened before Linda was strangled. Fukumoto also testified that pain is associated with strangulation and that pain or stress can result in someone urinating on themselves.

    d.    Tran's and Plata's Statements to Friends

Jin Ae Kang, Tien Tran, and Linda Le testified about statements made by Tran and Plata. Some months after Linda's death, Kang learned that Tran told Tien Tran that he was involved in murdering a girl in Irvine, that the girl had recognized him, that she was bound, and that some cash and gold items were taken from the girl's home. At trial, Trien Tran testified that he vaguely remembered that Tran had told him he had killed somebody.

In an interview in January 2000, Linda Le told the police about statements by Plata. There, Le told law enforcement officers that she had overheard a conversation about "the incident" between Plata and her boyfriend, Terry Tackett, in which Tackett asked Plata if he had cleaned the knife. Le told law enforcement officials that, a few days after the conversation between Plata and Tackett, Plata was sad and upset and told

her that he did not mean to do it and that he had robbed a house and the girl was home.

e.       Tran's and Plata's Conversations with Qui Ly

Qui Ly was a well-respected member of the V gang, a gang allied with the VFL gang, and he testified about his various conversations with Tran and Plata. In a conversation in a Vietnamese restaurant, Plata told Ly about the murder of a young girl in Irvine. Ly testified that, while Ly and Tran were housed together at Anaheim City Jail from October 20, 1997, to November 21, 1997, Tran told him about a murder of a young girl in Irvine.

Later, Ly was convicted in 1999 for residential burglary and faced a potential sentence of 31 years to life in prison because of his prior strikes, so he decided to provide information to law enforcement about criminal activities throughout Southern California "to get some consideration on [his] sentence." In October 1999, Ly told Ronald Seman, an investigator on the Orange County District Attorney's Office's regional gang enforcement team, about Tran's and Plata's statements.

Based on this information, Seman arranged to place Ly in a cell in the Santa Ana jail so that he could speak with Tran and Plata separately. On February 28, 2001, Ly was first placed in a cell with Tran and then placed in one with Plata. Microphones were hidden behind a toilet paper holder in the cell, and the conversations were recorded. Portions of these conversations were played for the jury, and we discuss them below.

f.       Joann Nguyen's Testimony

Joann Nguyen was Tran's girlfriend in 1995 and testified about Linda, Tran, Plata, and the robbery. Nguyen was friends

6

with Linda in high school, and they attended Irvine Valley College, where they drifted apart. When Tran asked if Nguyen knew anyone with money or jewelry, Nguyen said that Linda had some, and she drove Tran by Linda's home after he said that he was going to rob Linda. Nguyen said that Linda had never told her where her father kept money or her mother kept jewelry.

On November 9, 1995, Tran arranged to switch cars with Nguyen at a parking lot, telling her that his car would look too suspicious in the Parks' neighborhood. Tran and Plata drove off in Nguyen's car around 7:00 p.m. that night and returned a few hours later, around 9:30 p.m. to 10:00 p.m. When they returned, Nguyen noticed that Tran and Plata moved a blanket from her car to Tran's car and that Tran and Plata appeared anxious and hyper. Tran told Nguyen that they had robbed and killed Linda.

Later, Tran told Nguyen that Linda was killed because Tran did not want her to identify him, and Tran told Nguyen that money and jewelry were taken from the Park home. After Linda's death, Tran received a new tattoo on the side of his neck, which he told Nguyen said "forgive me" in Korean.

g.     Gang Evidence

At the guilt phase, the prosecutor called Mark Nye to testify as a gang expert about gang culture, the VFL gang, Tran's and Plata's membership in the VFL, and how a hypothetical robbery like this one may support a criminal street gang. Vietnamese gangs, Nye testified, are not turf oriented because their members typically do not live in the same area. "Most of the Asian gangs are in it for the economic gain," Nye said, and he explained how each gang member has an assigned role during a crime that they are expected to fulfill.

The VFL gang, Nye continued, was formed in the early 1990s and began by committing petty crimes, though became affiliated with the "V" gang, a violent gang that specialized in home-invasion robberies. Eventually, VFL members began robbing homes and cars, sold weapons, possessed narcotics, extorted business throughout the Gardena and Hawthorne area, and murdered or attempted to murder rival gang members. Nye opined that the VFL was a criminal street gang in November 1995, with about 20 to 30 members, whose primary activities were residential burglary, attempted murder, and murder. In reaching this opinion, Nye relied on documents and reports about crimes committed by certain VFL members.

Nye also opined that Tran and Plata were members of and actively participated in the VFL in November 1995. In answering the prosecutor's question about a hypothetical case like this one, Nye opined that both individuals would be expected to support one another during the crime and that robbery, burglary, and murder would have been done for the benefit of, at the direction of, and in association with that criminal street gang. The gang supports itself with proceeds from criminal activity, and crimes enhance the gang's and the gang members' reputations.

### 2. Defense Case

Neither Tran nor Plata called any witnesses to testify during the guilt phase of their trial, though both challenged the testimony of various witnesses via cross-examination.

### B. Penalty Phase

#### 1. *Prosecution Case*

a. Prior Bad Acts

On June 24, 1992, David Schonder, who lived in Mission Viejo, reported that jewelry, camera equipment, a telephone, and a video camera were missing from his home. Three latent fingerprints recovered from his home were identified as Tran's, and Tran admitted an allegation in a juvenile petition that he had committed this residential burglary.

On June 26, 1992, a California Highway Patrol officer detained Tran and David Du after arriving at the scene of a car accident and hearing that one of the people involved in the accident had dropped a metal box in the trash. The metal box contained paperwork belonging to David Nesthus. Tran was taken to an Orange County Sheriff's station, where he told an officer that he and two others stole a television, a camcorder, about 150 quarters from a coin-filled jug, some fake jewelry, and a Nintendo video game from the Nesthus home. Tran later admitted an allegation in a juvenile petition that he had committed this residential burglary.

On April 19, 1994, Darin Urabe discovered that a Smith Corona word processor, a computer, and a camcorder were missing from his Huntington Beach home. The home's garage door was open, and a baby seat and a spare tire that did not belong to the Urabes was in the garage. The day after, on April 20, 1994, Tran and Linda Vu were arrested after a car chase prompted by an Orange County detective's discovery that Tran and Vu were in a stolen car. During this car chase, Tran drove against traffic, ran a red light, drove about 45 to 50 miles per hour in a store parking lot, and drove about 90 miles an hour in

a residential area. The trunk of the car that Tran had driven contained stereos, a Smith Corona word processor, and amplifiers, among other items. For this, Tran was convicted of residential burglary (§ 459) and evading a police officer (Veh. Code, §§ 2800.2, 10851).

b. Victim Impact Evidence

At the penalty phase, the prosecutor called Sunhwa, Linda's father; Janie, her sister; and Fox, her neighbor, to testify about the impact of Linda's death. Their testimony was sometimes accompanied by photographs or videos of Linda or her personal items, as discussed below. (*Post*, pt. IV.C.)

2. *Defense Case*

a. Cultural Expert

Tran's counsel called Jeanne Nidorf, a cultural expert and consultant with a background in psychology and public health, to testify about Tran from his childhood to his adulthood. Tran was born in a refugee camp in Arkansas before moving with his family to California. Tran's father is a machinist; his mother, an electronic assembler. Nidorf said that Tran's parents' relationship was confrontational, explaining that Tran's mother, Cam, was "a sort of verbally abusive, somewhat cruel, sometimes bizarre, self-centered, histrionic woman." Nidorf recounted how Tran's mother would discipline him as a child, including by holding him over a tub filled with hot water and threatening to drop him in if he did not behave. Cam often drew comparisons between Tran and his older brother, Hung Tran, who Cam thought had achieved more. Nidorf said that Tran called his family life "gloomy," and she explained how Tran was attracted to the VFL because it allowed him to escape family pressures.

Nidorf also discussed Tran's actions following Linda's death. After her death, Tran attended a motivational seminar and became more respectful to his parents. In 1998 or 1999, Tran met Kathy Nguyen, and they had a son together. Nidorf explained that Tran changed after his son was born; he remained employed and was not involved in criminal activity. And Nidorf asked Tran why he got the tattoo on the side of his neck that said "forgive me"; she said that "he looked down and he said 'I — I don't know why.' "

b.    Testimony of Family and Friends

Hung Tran, Tran's older brother, testified about their upbringing and Tran's character. They were "latchkey kids" because their parents worked so much, Hung remarked, though they grew apart as they grew older and their interests diverged. In 1996, Hung gifted Tran the opportunity to attend the motivational seminar. After the birth of Tran's son, Tran was "very responsible" and "was at home almost all the time," Hung said.

Besides Hung, 10 other family or friends testified about their experiences with Tran and his positive qualities. For instance, Thu Thi Tran, Tran's cousin, testified that she had known Tran all her life and that he had always "been a sweetheart" and had "a lot of respect" for her. Thao McGrath, Tran's cousin, testified that Tran "was a normal kid" who had "never got into fights." And Tony Bui, Tran's uncle, recalled that Tran was "very friendly" and a "nice person" and that Cam loved Tran "but [didn't] know how to raise him."

### 3. *Juror No. 7's Typewritten Document*

After the jury returned its penalty determinations, a three-page typewritten document was found in the jury room in

a folder containing the jury instructions. This document was written by the penalty foreperson, Juror No. 7, and we discuss it below.

## II.  PRETRIAL ISSUES

### A.  Removing Prospective Jurors by Stipulation

Tran first claims that the trial court improperly allowed the parties to remove prospective jurors from the jury pool by allowing the parties to stipulate to their removal based on their answers to a written questionnaire.

#### 1.  Facts

During jury selection, the prosecutor prepared a written questionnaire for prospective jurors to complete. Neither Tran's nor Plata's counsel objected to this questionnaire. After counsel reviewed the questionnaires, they identified 20 prospective jurors whom they agreed to excuse for cause without questioning them. The prosecutor read the prospective jurors' numbers aloud in court, counsel stipulated to their removal, and the court excused them.

#### 2.  Analysis

Tran argues that excusing these 20 prospective jurors in this way violates the random-selection provisions of Code of Civil Procedure section 222, the initial-examination provisions of Code of Civil Procedure section 223, and the jury-trial policy of Code of Civil Procedure section 191.

Under Code of Civil Procedure, section 222, subdivision (a), courts must "randomly select the names of the jurors for voir dire, until the jury is selected or the panel is exhausted." (See *People v. Flores* (2020) 9 Cal.5th 371, 383 (*Flores*).) Under Code of Civil Procedure section 223, subdivision (a), trial judges "shall

conduct an initial examination of prospective jurors" "[t]o select a fair and impartial jury in a criminal jury trial." (See *Flores*, at p. 383.) And Code of Civil Procedure section 191 spells out California's jury-trial policy: Among other things, jurors must be randomly selected, all qualified persons must have an equal opportunity to be considered for jury service, and all qualified persons must serve as jurors when summoned. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 38.)

We "have consistently rejected similar challenges to the excusal of jurors under similar mutually agreed-upon prescreening procedures. 'A court may allow counsel to screen juror questionnaires and stipulate to juror dismissals.' [Citations.] Further, 'a stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool.' " (*Flores*, *supra*, 9 Cal.5th at p. 384; see also *id.* at pp. 383–384 [rejecting argument that defendant had not forfeited challenge to prospective juror prescreening procedure despite defendant's invocation of Civ. Code, § 3513].) Because Tran agreed to this questionnaire procedure below, he has forfeited his claim here.

Even if Tran's claim was preserved, it lacks merit. "Contrary to defendant's argument, neither Code of Civil Procedure section 222 nor section 223, subdivision (a) forbids the prescreening procedure employed in this case. Section 222 requires random selection of prospective jurors for voir dire but says nothing about prescreening through a questionnaire. Section 223, subdivision (a), which requires the trial court to conduct an initial examination of prospective jurors, does not bar the court from exercising its discretion to allow counsel to prescreen jurors and stipulate to dismissals." (*Flores*, *supra*, 9 Cal.5th at p. 384.)

Nor do Tran's remaining arguments fare any better. He contends that the questionnaire procedure used here "allows the parties to trade discriminatory removal of potential jurors." But he "has not alleged that any of the stipulated removals were discriminatory." (*Flores*, *supra*, 9 Cal.5th at p. 384.)

He asserts that this procedure undermines his right to a jury selected from a fair cross-section of the community. But he has not "adequately explain[ed] how permitting him to stipulate to the dismissal of certain jurors could have undermined his right to trial by a jury selected from a fair cross-section of the community." (*Flores*, *supra*, 9 Cal.5th at p. 384.)

And Tran argues that this procedure "frustrates the public policy requiring that voir dire be open to the public." But "voir dire in this case was open to the public; the trial court simply permitted the parties to stipulate to the removal of certain jurors based on their written questionnaire responses. Having agreed to this procedure, defendant may not now complain that it violated his right to a public trial." (*Flores*, *supra*, 9 Cal.5th at p. 384.)

In sum, we conclude that the trial court did not err by excusing prospective jurors according to the parties' stipulation to remove jurors based on their responses to this written questionnaire.

## B. Challenge to the "Substantial Impairment" Standard

Next, Tran claims that the so-called substantial impairment standard used to excuse prospective jurors for their views on capital punishment is inconsistent with the impartial-jury guarantees under the state and federal Constitutions. Tran asserts that the trial court "presumably" excused Prospective

Jurors No. 112, 158, 214, and 234 for cause because of their views on the death penalty.

"The state and federal Constitutions guarantee a criminal defendant the right to a trial by an impartial jury." (*People v. Martinez* (2009) 47 Cal.4th 399, 425.) " ' "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 137 (*Suarez*); see also *Wainwright v. Witt* (1985) 469 U.S. 412; *Witherspoon v. Illinois* (1968) 391 U.S. 510.)

Tran does not challenge how the standard was applied here; he does not argue that the standard was wrongly applied to excuse a prospective juror who should not have been excused under the standard. Rather, Tran asks us to reconsider the substantial-impairment standard itself primarily in light of the founding-era history of the guarantee to an impartial jury, as the high court has done in the context of other Sixth Amendment doctrines in decisions from *Jones v. United States* (1999) 526 U.S. 227 to *Blakely v. Washington* (2004) 542 U.S. 296. This history, Tran says, reveals that the framers intended the impartial-jury guarantee to prohibit the excusal of prospective jurors because of their views on the death penalty.

Tran did not object to the excusal of Prospective Jurors No. 112, 158, 214, and 234, but the Attorney General does not argue he has forfeited the claim. A challenge to the substantial impairment standard would have been futile in any event because at the time of Tran's trial, as now, the substantial impairment standard was supported by binding precedent. We

typically excuse failures to raise futile objections. (*People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4.) Regardless, we decline to reconsider our decisions here. Tran recognizes that we have rejected this challenge in *People v. Rices* (2017) 4 Cal.5th 49 (*Rices*). There, we rejected defendant's argument that the substantial-impairment standard should be abandoned and "replaced with a new rule prohibiting the trial court from excusing prospective jurors due to their views on the death penalty." (*Rices*, at pp. 79–80.) But the high court, we explained, "developed that standard and has recently reiterated it. [Citation.] If that standard is to be abandoned or modified, and death qualifying the jury prohibited, it is up to that court to do so." (*Id.* at p. 80; see also *Suarez, supra,* 10 Cal.5th at p. 138 [" 'We may not depart from the high court ruling as to the United States Constitution' "].) And as recently as last year, "we have considered and rejected claims that the death qualification process is unconstitutional." (*Suarez*, at p. 138; see *id.* at pp. 137–140 [summarizing and rejecting many constitutional challenges to the death-qualification process].)

Nor do we accept Tran's request to revisit the substantial-impairment standard in light of the jury-trial right under article I, section 16, of the California Constitution. We "have long adopted the *Witt* rule as also stating the standard under the California Constitution." (*Rices, supra,* 4 Cal.5th at p. 80, citing *People v. Ghent* (1987) 43 Cal.3d 739, 767 ["Because we think *Witt*'s review standard and underlying rationale make good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopt the *Witt* standard."].)

As Tran recognizes, "past California cases make clear 'that the state constitutional right to a jury trial "is the right as it existed at common law in 1850, when the [California] Constitution was first adopted." ' " (*Shaw v. Superior Court* (2017) 2 Cal.5th 983, 994–995.) Tran relies on founding-era materials, relating to the federal Constitution, to support his state constitutional claim, but fails to persuade us that these materials reflected the state of the common law as it existed in 1850.

In sum, we reject Tran's challenge to the substantial-impairment standard.

## III.   GUILT PHASE CLAIMS

### A.  Motion To Sever and Limiting Instruction

Tran argues that the trial court erroneously decided against severing his case from Plata's. Tran's argument centers on out-of-court statements that Plata made. Some of these statements incriminated Plata but implied that Tran had actually killed Linda. Others incriminated Plata and implied that Plata was the actual killer. Yet the guilt jury was instructed to consider Tran's and Plata's out-of-court statements "only against the defendant making the statements and not against the other defendant." The admission of these statements together with this limiting instruction, Tran contends, violated the *Aranda-Bruton* doctrine, rendered his trial fundamentally unfair, and requires reversal of his conviction and sentence.

#### 1.  Facts

Before trial, Tran moved to sever his case from Plata's partly over concerns that the prosecutor would introduce certain

17

statements that Plata made before trial. But the trial court denied this motion.

Later, during the guilt phase of the trial, the trial court, defense counsel, and the prosecutor discussed the prosecutor's plan to have Qui Ly testify. The prosecutor explained that he intended to introduce conversations between Ly and Plata and between Ly and Tran. These conversations happened on February 28, 2001 before either the complaint or the information had been filed against Tran or Plata and while Ly, Tran, and Plata were incarcerated in the Santa Ana jail.

The trial court decided to allow the jury to hear these conversations and, at the end of the guilt phase, to instruct the jury with a version of CALCRIM No. 305. This instruction said: "You have heard evidence that each of the two defendants made statements out of court and before the trial. You may consider that evidence only against the defendant making the statements and not against the other defendant." Tran's counsel did not request this instruction at the penalty phase, nor was it otherwise given.

In light of the trial court's decision to allow the jury to hear these statements by Plata, Tran's counsel believed that the trial court's "other remedy is to declare a mistrial as to Mr. Tran and allow him to have a separate trial" and moved for a mistrial, which the trial court denied.

So Ly testified about, and the jury heard, his recorded jailhouse conversations with Tran. In these conversations, Tran told Ly that he had been arrested for a murder in Irvine. Ly asked: "They got you for this murder, you think they got you good?" Tran replied: "I don't know dog. You know I don't even

know what they got on me. You know if Noel's talking you know, I'm screwed, that's all I got to say. That's the only way."

Ly then asked: "But who killed her, you or him?" Tran did not respond verbally. Ly testified that Tran had pointed to himself and nodded his head. Then Ly replied: "Man, you idiot." Tran replied: "Yeah, I know, I know man. Now I gotta live with it." Ly testified that Tran's gesture was why he had replied with, "Man, you idiot." Ly later asked: "Man. What the fuck, fuck, you take her out for, you idiot?" Tran replied: "I don't know what to say, man. Tie 'em up, you know. What can you do?"

Ly also asked: "Was it worth it?" Tran replied: "Nah." "It was supposed to be worth it," Tran said, explaining that it was supposed to be worth "about ten." "[T]en was attractive to a nineteen year old dog" "driving a 1979 beat up car," Tran stated. "No matter what, you know what I'm saying? No matter what happens, you know, 'Co Chai Co Chieu[.]' That's the way America is dog. I got to accept it. Can't live in denial dog," Tran continued. Ly responded: "If you do it, you have to accept it." Tran replied: "Yeah, I can handle it dog." The prosecutor asked Ly what "Co Chai Co Chieu" meant; Ly testified that it was a Vietnamese saying that meant, "You play, you pay and accept." Later, when Ly said, "They don't, you don't have none of that girl's property at your house do you," Tran laughed and said, "Dude, come on now, it's all good, it's all good."

Ly also testified about, and the jury heard some of, his recorded jailhouse conversations with Plata. Besides these snippets that the jury heard, the prosecutor also asked Ly about parts of his jailhouse conversation with Plata that had not been played for the jury. "Mr. Ly," the prosecutor said, "in your taped

conversation with Mr. Plata" — which the jury had not heard — "did Mr. Plata tell you that he was there in Irvine at the residence; he was involved in the robbery but he did not do this murder?" "Yes," Ly replied.

The prosecutor then asked: "Did Mr. Plata tell you that he was there in Irvine for the robbery but he did not strangle the victim?" "Yes," Ly replied.

The prosecutor continued: "In your conversation with Mr. Plata, in reference to the murder, did he say something to you that there was nothing he could do in connection with the murder of Linda Park?" "Yes," Ly replied.

And the prosecutor asked: "Did he tell you in connection with the murder of Linda Park and what he did, that he was pissed off, and that he had to go back inside the house to take something off?" "Yes," Ly replied.

On recross-examination, Tran's counsel asked Ly about a conversation between Ly and Plata that happened in a restaurant in 1996, which Plata had later reported to law enforcement. Ly testified that he had remembered telling law enforcement that he had asked Plata during this conversation if Plata had killed Linda and that "Plata admitted to him that [Plata] had killed the Korean girl." Ly also testified that he remembered telling law enforcement that Plata told him "that he[, Plata,] had to do it."

On redirect examination, Ly stated Plata had said that he "was involved in it" and "was there," from which Ly "initially assumed that he's the one that did it."

In another recorded conversation, Plata told Ly that Tran's neck tattoo — which Tran had received after Linda's death — was meant to convey "blow me" or "suck me." Later,

the parties stipulated that this tattoo's Korean-to-English translation was "forgive."

### 2. *Analysis*

Although section 1098 expresses a general preference that codefendants be tried jointly, a trial court may try such defendants separately if one defendant's incriminating confession implicates a codefendant, if a joint trial seriously risks compromising one defendant's trial right, or if a joint trial seriously risks preventing the jury from reliably determining the defendants' guilt or innocence, among other reasons. (*People v. Homick* (2012) 55 Cal.4th 816, 848 (*Homick*).) Underlying Tran's arguments about severance is an argument that he was constitutionally entitled to severance to preserve his Sixth Amendment confrontation rights. Whether our review is de novo (*People v. Cromer* (2001) 24 Cal.4th 889, 901; *People v. Washington* (2017) 15 Cal.App.5th 19, 26 [reviewing de novo claims that the defendant was entitled to severance under *Aranda-Bruton* and due process]) or for abuse of discretion, we find no error.

Tran and Plata "were 'charged with having committed "common crimes involving common events and victims," ' presenting a ' " 'classic case' " for a joint trial.' " (*Homick*, *supra*, 55 Cal.4th at p. 849.)

Still, Tran argues that the admission of Plata's statements to Ly that implied that Tran actually killed Linda violated his Sixth Amendment confrontation clause rights under the *Aranda-Bruton* doctrine. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.) Recall that Plata had allegedly said that he was involved in the Irvine robbery but "did not do this murder," "did not strangle the

victim," could do "nothing" "in connection with the murder of Linda Park," and "was pissed off." (*Ante*, pt. III.A.1.) The *Aranda-Bruton* doctrine "addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant," and prevents such a statement's admission even if a limiting instruction is given to the jury. (*People v. Capistrano* (2014) 59 Cal.4th 830, 869 (*Capistrano*).)

As the Attorney General persuasively argues, however, the confrontation clause issues addressed by the *Aranda-Bruton* doctrine only applies to testimonial statements after *Crawford v. Washington* (2004) 541 U.S. 36 and its successors. In *Crawford*, "the United States Supreme Court held that the confrontation clause of the federal Constitution generally bars the admission of what it termed 'testimonial' hearsay when offered by the prosecution against a criminal defendant without a showing of witness 'unavailability and a prior opportunity for cross-examination.' " (*People v. Valencia* (2021) 11 Cal.5th 818, 830 (*Valencia*).)

The *Crawford* court " 'dramatically departed' " from confrontation clause precedent, which had generally permitted statements of unavailable witnesses to be admitted at trial so long as these statements were reliable enough. (*People v. Pearson* (2013) 56 Cal.4th 393, 462.) Although it took no firm stand on the matter in *Crawford*, "the high court has nonetheless emphasized that only hearsay statements that are 'testimonial' are subject to the confrontation clause." (*People v. Fayed* (2020) 9 Cal.5th 147, 168 (*Fayed*).) In *Davis v. Washington* (2006) 547 U.S. 813, 824 (*Davis*), the high court explained that testimonial statements "must fairly be said to mark out not merely" the " 'core' " of the confrontation clause,

"but its perimeter." And about a year later, in *Whorton v. Bockting* (2007) 549 U.S. 406, 420, the high court remarked that "the Confrontation Clause has no application" to nontestimonial statements.

The upshot of this departure is that the Sixth Amendment protections under the *Aranda-Bruton* doctrine, whatever their reach before, are confined to testimonial statements now. We have said as much before. In *People v. Cortez* (2016) 63 Cal.4th 101, 129, the defendant argued that the trial court's admission of a codefendant's statements to a witness that incriminated the defendant "violated her Sixth Amendment right to confront and cross-examine witnesses," mainly relying on *Bruton*. But we rejected this argument because *Bruton* "involved a nontestifying codefendant's hearsay statement" that was inadmissible under traditional rules of evidence, whereas this codefendant's statement was admitted as a statement against penal interest. (*Cortez*, at p. 129.) We also observed that "the high court unequivocally held 'that the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial.' " (*Ibid.*, quoting *People v. Geier* (2007) 41 Cal.4th 555, 603.)

Other courts, state and federal alike, have said as much too. Our Courts of Appeal have held that *Crawford* narrowed confrontation clause rights under the *Aranda-Bruton* doctrine to testimonial statements only. (E.g., *People v. Gallardo* (2017) 18 Cal.App.5th 51, 69; *People v. Arceo* (2011) 195 Cal.App.4th 556, 575.) Every federal court of appeals that has confronted this issue has concluded that *Bruton* is inapplicable to nontestimonial hearsay after *Crawford*. (*U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85 (*Figueroa-Cartagena*); *U.S. v. Williams* (2d Cir. 2007) 506 F.3d 151, 156; *U.S. v. Berrios*

(3d Cir. 2012) 676 F.3d 118, 128; *U.S. v. Benson* (4th Cir. 2020) 957 F.3d 218, 233; *U.S. v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378–379; *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 325; *U.S. v. Avila Vargas* (8th Cir. 2009) 570 F.3d 1004, 1008–1009; *Lucero v. Holland* (9th Cir. 2018) 902 F.3d 979, 988 (*Lucero*); *U.S. v. Clark* (10th Cir. 2013) 717 F.3d 790, 815–816; *U.S. v. Wilson* (D.C. Cir. 2010) 605 F.3d 985, 1016.) And other jurisdictions have concluded similarly. (*Fisher v. Commonwealth* (Ky. 2021) 620 S.W.3d 1, 8; *State v. Nieves* (Wis. 2017) 897 N.W.2d 363, 366; *State v. Wilcoxon* (Wash. 2016) 373 P.3d 224, 229; *Burnside v. State* (Nev. 2015) 352 P.3d 627, 643; *State v. Payne* (Md. 2014) 104 A.3d 142, 162; *State v. Gurule* (N.M. 2013) 303 P.3d 838, 848–849; *Thomas v. U.S.* (D.C. 2009) 978 A.2d 1211, 1224–1225.)

Even so, Tran asserts that the *Aranda-Bruton* doctrine continues to apply to nontestimonial hearsay statements because this doctrine has "fundamentally different purposes" than *Crawford*. *Crawford*, Tran says, concerns the admissibility of hearsay, whereas *Bruton* concerns the prejudicial effect of inadmissible hearsay on a jury. But "both *Bruton* and *Crawford* have the same origins — the importance placed on cross-examination in the Confrontation Clause, and the prejudice defendants face when they are unable to cross-examine 'powerfully incriminating' statements." (*Lucero, supra*, 902 F.3d at p. 987.) "*Crawford*," as the Ninth Circuit has explained, "concluded after a historical analysis that the Confrontation Clause was concerned only with certain kinds of out-of-court statements — those derived from interrogations and other forms of 'the civil-law mode of criminal procedure.' " (*Ibid.*) "*Bruton*'s narrower focus," on the other hand, "was on whether statements that would otherwise violate the Confrontation

Clause may be introduced in a joint trial. Its holding —
essentially, that such statements may not be introduced if the
defendant is identifiable — does not define, or redefine, the
basic scope of the Confrontation Clause's protections." (*Ibid*.)

But even if Tran's characterization of the respective
purposes of *Crawford* and *Bruton* is sound, his argument comes
up short: The fact that the confrontation clause may serve
different purposes — even fundamentally different ones — does
not answer the question of whether its protections apply in the
first place. (See *Figueroa-Cartagena, supra*, 612 F.3d at p. 85
["The threshold question in every case is whether the challenged
statement is testimonial."].)

In sum, because the confrontation clause applies only to
testimonial hearsay statements, the *Aranda-Bruton* doctrine's
Sixth Amendment protections likewise apply only to testimonial
hearsay statements. "Generally speaking, a declarant's hearsay
statement is testimonial if made 'with a primary purpose of
creating an out-of-court substitute for trial testimony.' " (*Fayed,
supra*, 9 Cal.5th at p. 168.)

Here, none of Plata's challenged statements are
testimonial. Plata and Ly's recorded jailhouse conversations
were not testimonial because Plata did not know that Ly was a
confidential informant and because he did not anticipate that
his statements would be used in a criminal proceeding. Under
these circumstances, such "[p]rivate communications between
inmates are not testimonial . . . ." (*People v. Hajek and Vo* (2014)
58 Cal.4th 1144, 1214 (*Hajek and Vo*); see *also Davis, supra*, 547
U.S. at p. 825 [observing that statements made unwittingly to a
Government informant "were clearly nontestimonial"]; *U.S. v.
Smalls* (10th Cir. 2010) 605 F.3d 765, 778 [defendant's "recorded

statement to [the confidential informant], known to [defendant] only as a fellow inmate, is unquestionably nontestimonial"].) Nor was Plata and Ly's 1996 conversation in a restaurant testimonial, for " 'a person who makes a casual remark to an acquaintance' " — like two acquaintances conversing in a restaurant — does not bear testimony " 'in a sense' " that " '[a]n accuser who makes a formal statement to government officers' " does. (*Davis*, at p. 824; see also *People v. Armstrong* (2019) 6 Cal.5th 735, 790 (*Armstrong*).)

Separate and apart from his *Aranda-Bruton* claim, Tran argues that the trial court's limiting instruction violated state law and federal due process. Had his case been severed, Tran asserts, he would have been able to admit Plata's self-incriminating statements as declarations against penal interest under Evidence Code section 1230, thereby advancing his argument that Plata was the actual killer without being hampered by a limiting instruction like the one used here. So the trial court should have severed his case or, failing that, modified the limiting instruction to allow the jury to consider Plata's self-incriminating statements in determining whether Tran was the actual killer. But Tran neither moved for severance on this ground nor objected to or requested a modification of this limiting instruction below, so he has forfeited these challenges here. (*People v. Nieves* (2021) 11 Cal.5th 404, 433, 436–437 (*Nieves*).)

Lastly, Tran cursorily argues that admitting Plata's statements implying that he was not the actual killer and that Tran was unremorseful violated the Eighth Amendment's heightened reliability requirement in capital cases. But Tran did not object to their admission for this reason below, so he has

forfeited this constitutional claim here. (*Nieves*, *supra*, 11 Cal.5th at p. 433.)

### B. Instructional Errors

Tran argues that four of the trial court's instructions to the guilt jury concerning the testimony of an in-custody informant and of an accomplice — versions of CALCRIM Nos. 301, 335, 336, and 358 — prejudicially violated his constitutional rights to present a defense and to proof beyond a reasonable doubt.

#### 1. Facts

As noted, the prosecutor called Qui Ly, the in-custody informant, and Joann Nguyen, the accomplice, to testify at the guilt phase. Ly testified about conversations between him and Plata and between him and Tran, among other testimony. Ly testified about conversations between him and Plata while both were incarcerated in 2001 and while they were in a restaurant in 1996. As noted, some of Plata's statements in these conversations implied that Plata actually killed Linda, while others implied that Tran was the actual killer. Ly testified that Plata told him that Tran's neck tattoo meant "blow me" or "suck me." And Ly testified about recorded jailhouse conversations between him and Tran, in which Tran seemingly pointed to himself and nodded his head when Ly asked him who had killed Linda.

Nguyen testified about a conversation between her and Tran, in which Tran discussed his neck tattoo that he had received after Linda's death. The prosecutor asked Nguyen: "[W]hat did Mr. Tran tell you that this tattoo says?" Nguyen answered: "Forgive me," and testified that Tran told her that the

tattoo was written in Korean. Later, counsel stipulated that this tattoo's Korean-to-English translation "means 'forgive.'"

The trial court instructed the guilt jury with versions of CALCRIM Nos. 301, 335, 336, and 358, among other instructions. CALCRIM No. 301 said in relevant part: "Except for the testimony of Joanne Nguyen, which requires supporting evidence, the testimony of only one witness can prove any fact."

CALCRIM No. 335, concerning accomplice testimony, stated in relevant part: "You may not convict the defendant of Murder or find any of the special circumstances or enhancement to be true based on the testimony or statement of an accomplice alone." Such a statement or testimony could be used for these purposes only if that statement or testimony was "supported by other evidence that you believe," was "independent of the accomplice's testimony or statement," and "tend[ed] to connect the defendant to the commission of the crime." This instruction also said: "Any testimony or statement of an accomplice that tends to incriminate the defendant should be viewed with caution."

CALCRIM No. 336, concerning in-custody informants, instructed the jury that Qui Ly was an in-custody informant. It also said in relevant part: "The testimony of an in-custody informant should be viewed with caution and close scrutiny."

And CALCRIM No. 358, concerning statements by defendants, stated in relevant part: "You have heard evidence that the defendant made oral or written statements before the trial. . . . It is up to you to decide how much importance to give to such statements." This instruction also said: "You must consider with caution evidence of a defendant's oral statement unless it was written or otherwise recorded."

Neither Tran's nor Plata's counsel objected to these jury instructions.

### 2. *Analysis*

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) Defense counsel did not object to CALCRIM Nos. 301, 335, 336, and 358. Yet to the extent that Tran "argues that the trial court erred in instructing the jury in a way that affected his substantial rights," Tran's "argument may still be heard on appeal." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1000 (*Ramirez*).)

Tran argues that these instructions prejudicially violated his constitutional rights to present a defense and to proof beyond a reasonable doubt under *Cool v. United States* (1972) 409 U.S. 100 (*Cool*). This is so, Tran asserts, because CALCRIM Nos. 335, 336, and 358 instructed the jury to view certain statements with caution (so-called cautionary instructions) and because CALCRIM No. 335 instructed the jury that an accomplice's inculpatory statement testimony must be supported by independent evidence (a so-called corroboration instruction).

But Tran overreads *Cool*. There, the high court held unconstitutional a jury instruction that directed the jury to give an accomplice's testimony " 'the same effect as you would to a witness not in any respect implicated in the alleged crime' " if " 'the testimony carries conviction and you are convinced it is true *beyond a reasonable doubt*.' " (*Cool, supra,* 409 U.S. at p. 102.) Because such an instruction allowed "the jury to convict despite its failure to find guilt beyond a reasonable doubt," the high court explained, it improperly burdened the defense. (*Id.*

at p. 103.) "No constitutional problem is posed when the judge instructs a jury to receive the prosecution's accomplice testimony 'with care and caution,' " the high court observed, but "there is an essential difference between instructing a jury on the care with which it should scrutinize certain evidence in determining how much weight to accord it and instructing a jury, as the judge did here, that as a predicate to the consideration of certain evidence, it must find it true beyond a reasonable doubt." (*Id.* at pp. 103, 104.)

Here, unlike in *Cool*, none of the challenged instructions required the jury to find certain evidence true beyond a reasonable doubt before it may be considered alongside other evidence. The cautionary instructions simply instructed the guilt jury "on the care with which it should scrutinize certain evidence in determining how much weight to accord it." (*Cool, supra*, 409 U.S. at p. 104.) We have discerned "no conflict" between cautionary instructions and "the requirement of proof beyond a reasonable doubt." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1184; see also *People v. Bivert* (2011) 52 Cal.4th 96, 118–121.) Nor did *Cool* address corroboration instructions, and we have upheld them regularly (e.g., *People v. Hoyt* (2020) 8 Cal.5th 892, 946) while rejecting *Cool*-based challenges to accomplice instructions (*People v. Lawley* (2002) 27 Cal.4th 102, 161–162).

*Cool* aside, Tran also argues that these versions of CALCRIM Nos. 301, 335, 336, and 358 did not properly direct the jury on how to consider the "useful and supportive testimony" of Ly and Nguyen. Tran says this is so for three reasons. First, Tran contends that the trial court should have sua sponte instructed the jury that exculpatory statements or testimony by accomplices or in-custody informants need not be corroborated. But CALCRIM No. 335 properly instructed the

jury on the corroboration requirement for inculpatory accomplice testimony or statements (see *People v. Howard* (2008) 42 Cal.4th 1000, 1022 [juries must be instructed that they "cannot convict a defendant on the testimony of an accomplice alone"]) and no corroboration requirement for inculpatory in-custody informant testimony or statements existed at the time of Tran's trial (see *People v. Huggins* (2015) 235 Cal.App.4th 715, 718). Having so instructed the jury, the trial court was not obligated to further instruct the jury that exculpatory testimony or statements need not be corroborated.

Next, Tran asserts that CALCRIM Nos. 336 and 358 should have been modified to instruct the jury that it need not have viewed with caution Plata's exculpatory statements, relayed through Ly and Nguyen, that implied that Plata was the actual killer. We find no error because there was ample reason for the jury to treat Plata's statements with caution. Plata's accounts were inconsistent given that they contained conflicting statements as to the roles Plata and Tran played in the murder. Telling jurors to exercise caution in the face of such conflicting statements from the same individual aligns with the generic, commonsense instructions on how to assess witness testimony. (See *People v. Holloway* (2004) 33 Cal.4th 96, 142 [finding no harm from instructions that were "supported by common sense, which many jurors are likely to indulge even without an instruction"].)

Finally, Tran contends that CALCRIM Nos. 301 and 335 erroneously instructed the jury to consider Nguyen's exculpatory testimony regarding the meaning of Tran's tattoo only if it was corroborated by other evidence. Any alleged error is harmless. Nguyen's testimony — testifying that Tran told her that his tattoo said, "Forgive me" — revealed nothing that the

parties' stipulation (that the tattoo means "forgive") did not reveal. Nguyen did not testify about Tran's intent behind the tattoo or what it connoted; she simply testified about what it said.

In sum, we conclude that the trial court did not violate Tran's constitutional rights to present a defense and to proof beyond a reasonable doubt by instructing the guilt jury with versions of CALCRIM Nos. 301, 335, 336, and 358.

## C. Sufficiency of the Evidence for Special Circumstance

Tran argues that the torture-murder special circumstance must be reversed because there was insufficient evidence that he "specifically intended to inflict extreme pain for purpose of revenge, extortion, persuasion, or a sadistic reason."

### 1. Facts

As noted, the prosecutor called Dr. Richard Fukumoto and Joann Nguyen to testify at the guilt phase. Fukumoto testified about how Linda died. He was a pathologist who had personally conducted thousands of autopsies during his decades-long career, and he testified that he had reviewed Linda's autopsy report, the photographs taken during her autopsy, and the testimony of the doctor who had prepared the report, Dr. Joseph Halka, a doctor who had worked for Fukumoto's medical group at the time of the trial.

Based on the materials he reviewed, Fukumoto opined that Linda died from asphyxiation by being strangled with an electrical cord that had been wrapped around her neck twice. The autopsy documents showed that Linda was bound by her wrists and feet before she died, Fukumoto continued, explaining that abrasions near her wrists and feet indicated that she

attempted to remove the bindings.  He testified that Linda was conscious when she was strangled.  And these documents showed that her lungs contained edema — fluid in the air sacs that is not ordinarily present — indicating that she did not die instantaneously, Fukumoto said.

Fukumoto also testified that there "were two slash, sharp instrument injuries" on Linda's neck.  These slash wounds, he testified, overlapped one another, were inflicted before she was strangled and died, and would have been caused by a sharp instrument like a knife or scissor's edge.

Yet Fukumoto also testified that these slash wounds were "not deep enough to cause immediate death."  Though these slash wounds were "potentially fatal" without medical aid because "a person who suffers this type of wound could die eventually," dying from them would "take time," Fukumoto said.

Later, during guilt phase closing argument, the prosecutor mentioned Fukumoto's testimony while arguing that the jury should find the torture-murder special circumstance true.  This testimony, the prosecutor said, proved that Tran intended to inflict extreme physical pain and suffering on Linda while she lived, stating: "You heard the testimony of Dr. Fukumoto about when she was alive, when she was conscious.  She was conscious up to the moment they started strangling her, and she was still struggling and fighting as Tran was strangling."  According to the prosecutor, this testimony proved that Tran intended to inflict such pain and suffering for the calculated purpose of extortion, persuasion, or any other sadistic reason:  "It's not about revenge, but all the other ones apply.  Extortion, to get her to tell them where the money and jewelry is.  Persuade, to

tell them where the money and jewelry is. And if that's not sadistic, nothing is. If that was not sadistic, nothing is."

Tran's counsel argued during guilt phase closing argument that "[t]here's no indication that they tried to do anything but kill her" and that there were "two reasonable interpretations" of the evidence, one of which was "that this was just a really inept way to kill somebody."

### 2. *Analysis*

"On review, we examine the entire record in the light most favorable to the prosecution to determine whether a rational jury could have found the circumstance true beyond a reasonable doubt." (*Armstrong*, *supra*, 6 Cal.5th at p. 792.) To prove a torture-murder special circumstance, the prosecutor must prove that a defendant both intended to kill and intended to torture, the latter of which means " ' "to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." ' " (*Ibid*.) The intent to torture " 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.' " (*People v. Smith* (2015) 61 Cal.4th 18, 52.)

Considering these circumstances in the light most favorable to the prosecution, a rational jury could have found the torture-murder special circumstance true beyond a reasonable doubt because it could infer that Tran intended to kill Linda and intended to torture her so that she would divulge the location of the money and jewelry in the Park home. As noted, Nguyen testified that Linda never told her where money

and jewelry were located at the Park home. Sunhwa testified that he typically stored money in a jacket in their master bedroom's closet and that his wife, Dong, typically stored her jewelry inside boxes in the drawer of her makeup table in the same room. Rolf Parkes, the Irvine police officer, testified that when he arrived at the Park home on the night of Linda's death, he discovered this jacket but found no money inside it and discovered two empty jewelry boxes atop a coffee table in the living room where Linda's body was found. And he testified that the rest of the home was in a "very orderly" condition and had not been ransacked. From this evidence, a reasonable jury could infer that Tran and Plata did not know where these valuables were located before they entered the Park home but learned it from Linda instead.

In addition, a reasonable jury could infer that Tran and Plata coaxed this information from Linda by binding her and slashing her neck. Although evidence of binding alone is insufficient to prove an intent to cause extreme pain or suffer for a sadistic purpose, "it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence." (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1188.) Linda's wrists and feet were bound behind her back, and she struggled to escape unsuccessfully, indicating that she had little if any way to defend herself against Tran or Plata. Plus, the "nature and placement" of the slash wounds — two overlapping slash wounds on her neck — allow a reasonable jury to infer that "these wounds could not have been inflicted inadvertently." (*People v. Crittenden* (1994) 9 Cal.4th 83, 141.) These slash wounds also "appear to have preceded" the fatal injury (*ibid.*), and they were not immediately fatal but caused such severe

bleeding that they would have killed Linda eventually. Indeed, Linda died not from these or other slash wounds but from another injury entirely: strangulation. A reasonable jury could infer that Tran bound Linda and slashed her neck twice to cause extreme pain or suffering so that Linda would divulge the location of the money and jewelry. (Cf. *People v. Turville* (1959) 51 Cal.2d 620, 632; see also *People v. Steger* (1976) 16 Cal.3d 539, 547.)

Citing *People v. Mungia* (2008) 44 Cal.4th 1101, Tran argues that a jury may conclude that a defendant intended to cause extreme pain or suffering for a sadistic purpose "only when the evidence showed 'the defendant deliberately inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering.'" But Mungia involved a torture-murder special circumstance finding based not on contentions that a "'defendant was motivated by revenge, extortion, or persuasion,'" but on a contention that the defendant sadistically intended "'"'to cause the victim to suffer pain in addition to the pain of death'"'" merely on the basis of the defendant's delivery of repeated blows to the victim's head." (*People v. Powell* (2018) 5 Cal.5th 921, 947–948, quoting *Mungia*, at p. 1136.) Because "nothing in the nature of the injuries [suggested] that defendant inflicted any of them in an attempt to torture [the victim] rather than to kill her," even though the killing was "brutal and savage," we held that the evidence did not suffice to support the torture-murder special circumstance finding. (*Mungia*, at p. 1137.)

The torture-murder special circumstance here, by contrast, could have been found true beyond a reasonable doubt based on evidence that Tran tortured Linda to persuade her to divulge the location of the money and jewelry. A reasonable jury

could infer that the slash wounds on Linda's neck were not inflicted only for the purpose of killing her. Linda was strangled, not slashed, to death. She may have died from the slash wounds eventually, but such a death would "take time." A reasonable jury could have concluded that these slash wounds were meant to torture her so that she would reveal the location of the money and jewelry.

Tran also disputes the conclusions drawn from the evidence. He argues that no evidence directly proves Tran and Plata asked Linda about the money and jewelry, and that "the insides of both a man's jacket and a woman's dressing table are quite logical places to find valuables in a home, and thus, no specialized knowledge from Linda would necessarily have been required." But " '[w]e "must accept logical inferences that the jury might have drawn from the circumstantial evidence." . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion [that] the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*People v. Clark* (2016) 63 Cal.4th 522, 625–626, citations omitted.) Indeed, Tran's counsel argued that the evidence proved nothing other than Tran and Plata's ineptitude in killing Linda. Yet the jury could have, and did, reject this view of the evidence.

In sum, we conclude that a reasonable jury could have found the torture-murder special circumstance true beyond a reasonable doubt, so reversal of this special circumstance is unwarranted.

### D. Amendments to Gang Enhancement Statute

Tran argues that recent amendments to the gang enhancement statute require reversal of the jury's true finding

of the section 186.22 gang enhancement, his guilt verdict, and the death judgment.

### 1. Facts

As noted, the prosecutor called Mark Nye to testify as a gang expert about gang culture, the VFL gang, Tran's and Plata's VFL membership, and how a hypothetical robbery like this one may support a criminal street gang.

In formulating his opinion about the VFL, Nye testified that he reviewed documents and reports relating to convictions and crimes committed by members of the VFL. These records concerned Se Hoang, Phi Nguyen, and Anthony Johnson. They comprised felony complaints, guilty pleas, minute orders, and other court documents. And they showed that Hoang, Phi Nguyen, and Johnson had pleaded guilty to various crimes, like first degree residential burglary, attempted residential burglary, or attempted murder, and that they were members of the VFL or had committed these crimes for its benefit. Nye discussed these records while he testified.

Later, the trial court instructed the guilt jury on the criminal street gang enhancement under section 186.22, subdivision (b). Among other things, the trial court instructed the jury that a "pattern of criminal gang activity" means "[t]he commission of, or attempted commission of, or conspiracy to commit, or conviction of, . . . any combination of two or more crimes."

At guilt phase closing argument, the prosecutor discussed the "gang enhancement." Saying he was "not going to go through it in detail," he reminded the jury that he "introduced the prior conviction of Se Hoang, . . . and Phi Nguyen and

Anthony Johnson." He continued: "You might be saying, 'Why did he introduce that?' Because that is one of the elements."

In a general verdict for Tran, the jury found true the section 186.22, subdivision (b) gang enhancement.

### 2. *Analysis*

"In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to eradicate 'criminal activity by street gangs.' " (*Valencia*, *supra*, 11 Cal.5th at p. 828.) Among other things, the STEP Act created "a sentencing enhancement for a felony committed 'for the benefit of, at the direction of, or in association with any criminal street gang' (§ 186.22, subd. (b)(1))." (*Valencia*, at p. 829.)

In 2021, the Legislature passed Assembly Bill No. 333 ( (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022. Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons." (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members "individually *or* collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been "*collectively* engage[d] in" by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have

been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational." (§ 186.22, subd. (g).)

Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense.

Tran argues that the amendments made to the elements of a section 186.22 gang enhancement require reversal of his gang enhancement finding. Tran also argues that the failure to bifurcate the adjudication of his gang enhancement charge and the rest of his charges, as newly enacted section 1109 directs upon a defendant's request, requires reversal of his guilt verdicts and death judgment. We conclude that reversal of the gang enhancement is required but not reversal of the guilt verdicts or death judgment.

Starting with the changes to the elements of a section 186.22 gang enhancement, the Attorney General concedes that the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) applies, and we agree. *Estrada* "stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii)

legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.) *Estrada* applies to statutory amendments "which redefine, to the benefit of defendants, conduct subject to criminal sanctions." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) Here, "Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22 — for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang . . . ." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 479; see also *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087; *People v. Sek* (2022) 74 Cal.App.5th 657, 666–667; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033; *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) These changes have the effect of "increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement," with obvious benefit to defendants like Tran. (*Lopez*, *supra*, 73 Cal.App.5th at p. 344.)

When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless "it appears beyond a reasonable doubt" that the jury verdict would have been the same in the absence of the error. (*People v. Flood* (1998) 18 Cal.4th 470, 504.) Here, the Attorney General concedes reversal, reasoning that the evidence presented at trial failed to establish that the gang members "collectively" engaged

in a pattern of criminal gang activity, as required by section 186.22 as newly amended. We agree. We need not resolve the contours of Assembly Bill 333's collective engagement requirement. Instead, because the jury was not presented with any discernible theory as to how VFL members "collectively engage[d] in" these predicate crimes (§ 186.22, subd. (f)), we merely hold, on this record, that the reversal of the gang enhancement is required. As the Attorney General requests (without objection from Tran), we vacate the enhancement without remand.

Next, Tran argues that newly enacted section 1109, which requires the trial court to bifurcate the adjudication of the underlying offense and the gang enhancement upon a defendant's request, applies retroactively and requires reversal of the guilt verdicts and death judgment.

As an initial matter, we note that Tran raised this section 1109 claim only in his supplemental reply brief. Generally, "arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) However, because the appellate authority holding that section 1109 applies retroactively was only issued after the time had passed for Tran to file his supplemental brief and the Attorney General has since been given the opportunity to respond to Tran's claim, the usual concerns regarding unfairness have been mitigated. The Attorney General does not argue forfeiture, and we proceed to the merits of Tran's section 1109 claim.

The question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal. (See e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567;

*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65.) We decline to resolve this split here because we conclude that any asserted error in failing to bifurcate was harmless as to Tran's guilt verdicts and penalty judgment.

We first reject Tran's contention that the failure to bifurcate constitutes structural error. Errors may be deemed structural according to " 'three broad rationales' ": where " 'the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest,' " " 'where the effects of the error are simply too hard to measure,' " or where " 'the error always results in fundamental unfairness.' " (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1077.) None of these reasons apply. First, the stated purpose of section 1109 is to reduce the prejudicial impact of gang evidence and to protect defendants from erroneous conviction. (Stats. 2021, ch. 699, § 2, subd. (d)(6) [section 1109 is designed to prevent the "further perpetuat[ion]" of "unfair prejudice in juries and convictions of innocent people"].) Second, errors relating to wrongful admission of evidence are traditionally subject to harmless error review (*People v. Schultz* (2020) 10 Cal.5th 623, 661 (*Schultz*)), demonstrating that the effects of these types of errors are not "simply too hard to measure" (*Christopher L.* at p. 1077). Finally, although the admission of gang evidence may sometimes result in fundamental unfairness (see, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 232), this is not always the case. We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime. (*People v. Williams* (1997) 16 Cal.4th 153, 194.) Additionally, the fact that section 1109 requires bifurcation only upon a

defendant's request suggests there are circumstances where a single trial remains appropriate.

We also reject Tran's argument that the *Chapman v. California* (1967) 386 U.S. 18 standard for federal constitutional error should apply when reviewing his guilty verdicts. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).) Such prejudice did not occur in this case. To establish Tran's guilt, the prosecutor relied mainly on the testimony and prior statements of a few key witnesses. As noted, Qui Ly's testimony was particularly damaging; he testified that both Tran and Plata told him about their involvement in the murder, and tapes of these conversations were played to the jury. Additionally, Joanna Nguyen, Tran's girlfriend, testified that shortly after the murder, Tran told her that he and Plata had killed the victim because they did not want her to identify him if she was questioned about the robbery.

In addition to this testimony, the prosecutor relied on the gang circumstances of the case to strengthen the case for guilt in two ways, neither of which rendered the trial fundamentally unfair. First, the prosecutor argued that any inconsistencies between the witnesses' trial testimony and their prior statements could be explained by the fact that they were members of the gang and feared retaliation. We have held that a trial court is entitled to admit evidence demonstrating a fear of testifying. (See *People v. Valdez* (2012) 55 Cal.4th 82, 137.) Second, the prosecutor also relied on the gang circumstances of the crime when arguing why Plata should be found guilty as an aider and abettor of Tran's act of killing the victim. Specifically,

while the evidence tended to show that Tran was the actual killer, the prosecutor argued that Plata should be found guilty as an aider and abettor because "in a gang case" it could be inferred that Plata would assist Tran in the murder as a fellow gang member. Whatever effect this had on Plata's case, it is hard to see how the prosecutor's argument was fundamentally unfair to Tran; the prosecutor's theory was that Tran was the actual killer, so there was no need for any gang evidence to demonstrate that he was guilty as an aider and abettor. Because the prosecutor's use of the gang evidence here did not render the trial "fundamentally unfair," the *Chapman* standard for federal constitutional error does not apply. (*Partida*, *supra*, 37 Cal.4th at p. 439.)

Applying the *People v. Watson* (1956) 46 Cal.2d 818 standard for state-law error, we find that Tran has failed to demonstrate prejudice as to his guilt verdicts. Tran argues that if the trials were bifurcated, the trial court might have exercised its discretion to exclude gang evidence. However, apart from describing the general risk of prejudice that may result from the admission of gang evidence, Tran does not explain how the exclusion of gang evidence in this case would have been reasonably likely to change the jury's verdict of guilt as to the underlying murder. The case for guilt here was strong, with multiple witnesses testifying that Tran had told them about his involvement in the killing. In the face of this evidence, defense counsel did not dispute that Tran and Plata had committed the robbery and murder, going so far as to argue that "[t]here's no indication that they tried to do anything but kill her" and that "[t]hese two guys apparently . . . went to do a robbery and they got terrible." Given the overwhelming evidence of guilt and lack of any credible defense theory in response, it is not reasonably

likely that a bifurcated trial would have changed the jury's verdict.

Similarly, we find it is not reasonably likely that the exclusion of gang evidence would have affected the jury's true findings on the robbery, burglary, and torture special circumstances. Tran argues that the gang evidence could have skewed the jury to find that Tran acted with the intent to kill or with reckless indifference to human life for purposes of the robbery or burglary special circumstance, or that he intended to inflict extreme physical pain and suffering for purposes of the torture murder special circumstances. Again, apart from pointing to the general risk of prejudice, Tran does not explain how the gang evidence here was likely to have influenced the jury's specific findings. When making the case for these special circumstances in closing arguments, the prosecutor did not mention Tran's or Plata's gang membership. Instead, the prosecutor relied on other facts that were conceptually distinct from the issue of gang membership — namely, the actual circumstances of the robbery and the autopsy evidence of the victim's injuries. It is not reasonably likely that exclusion of gang evidence would have affected the jury's findings on these special circumstances.

As to whether the failure to bifurcate was prejudicial as to Tran's death judgment, we ask if " 'there is a reasonable possibility such an error affected the verdict,' " a standard that is " 'the same, in substance and effect' " as the standard set out in *Chapman.* (*People v. Nelson* (2011) 51 Cal.4th 198, 218, fn. 15.) We find no such reasonable possibility. Section 1109 only requires bifurcation as to "[t]he question of the defendant's guilt of the underlying offense" and the "truth of the enhancement." (*Id.*, subd. (a)(1), (2).) It makes no change to the

manner in which the penalty phase of capital proceedings should be conducted. Given the usual rule that any evidence admitted at the guilt phase may be considered at the penalty phase (*People v. Garton* (2018) 4 Cal.5th 485, 522), any evidence admitted in a bifurcated trial, including any gang evidence, could have been considered during Tran's penalty phase. Accordingly, we cannot conclude that there was a reasonable possibility that a bifurcated trial at the guilt phase would have affected the penalty phase decision.

In sum, we conclude that the amendments made to the gang enhancement law by Assembly Bill 333 require reversal of the jury's true finding of the gang enhancement, but not reversal of the guilt verdicts or death judgment.

## IV. PENALTY PHASE CLAIMS

### A. Inadmissible Hearsay in Gang Expert Testimony

Tran argues that during the guilt phase, Nye relied on inadmissible hearsay when testifying as to Plata's gang membership, Tran's gang membership, and Tran's lack of remorse. Tran further argues that the prosecutor relied on these three factual assertions in arguing for the death penalty and that these errors require reversal of the death judgment.

### 1. *Facts*

As noted, during the guilt phase, gang expert Nye testified as to his opinion that Plata and Tran were VFL members.

In reaching his opinion that Plata was a VFL member, Nye considered letters between Plata and other VFL members, a 1996 field identification card showing that Plata had admitted to his gang membership, a 1993 report where Plata admitted that he was a VFL member, and statements by other individuals to the police that Plata had told them he was a VFL member.

As to Tran's gang membership, Nye considered a police contact in 1993 where Tran admitted that he was a member of VFL. Nye also considered eight to ten other contacts between law enforcement and Tran, and a book that Tran had in his house that contained handwritten notes including "Scrappy," "Viets for Life," and "Fuck T.R.G." with "T.R.G." crossed out.

Nye also considered Tran's numerous tattoos, which included a map of Vietnam, the words "In loving memory of Viet," the years that Tran was incarcerated, his nickname "Scrappy," a "V" surrounded by rays, a Vietnamese saying that translates to "no good deed has been returned by my father and other by me," and Korean characters, translated as "Forgive." As for the tattoo of the Vietnamese saying, Nye claimed based on his general experience with "thousands of gang members" that "a lot of Asian gang members get that tattoo," which is intended to mean "I disrespected my mom and dad" and to convey their willingness to participate in criminal activity. As to the "Forgive" tattoo, Nye testified that such a tattoo would be seen "within the gang subculture" as indicating that Tran was "taking credit for" the murder of a Korean. This opinion was "reinforced by" Nye's consideration of the taped jailhouse conversation between Plata and Ly, wherein Plata said that Tran intended for the tattoo to mean "blow me or suck me."

Probation officer Timothy Todd also testified that Tran's "Forgive" tattoo was a form of bragging. In formulating this opinion, Todd took into consideration his general "training and experience" as well as the jailhouse conversation between Plata and Ly.

### 2. *Analysis*

In *People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*), we held that "[w]hen an expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." Typically, the standard for evaluating whether *Sanchez* error is prejudicial turns on whether the statement is testimonial. (*Valencia*, *supra*, 11 Cal.5th at p. 840 [stating that *Watson* "ordinarily" applies but that *Chapman* applies if the improperly admitted hearsay is testimonial such that its admission also violates the confrontation clause].) However, because Tran asserts prejudice as to his death judgment, we ask if " 'there is a "reasonable (i.e., realistic) possibility" the error affected the verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 163.) Applying this standard, we find each of Tran's asserted errors harmless.

First, regarding Plata's gang membership, while Tran is correct that some of the evidence relied upon by the expert, such as the field identification card and police reports, constitutes inadmissible hearsay based on our reasoning in *Sanchez*, there was independent admissible evidence that Plata was a member of the VFL. In particular, the jury heard testimony by Linda Le and Qui Ly, both of whom unequivocally testified that Plata was a member of the VFL.

Second, any *Sanchez* error regarding Tran's gang membership was also harmless. As Tran concedes, Nye was entitled to rely on the authenticated photographs of his tattoos. Nye was further entitled to rely on his generalized knowledge, gained from his experience with thousands of gang members, to offer an opinion as to the meaning of the tattoos and why they

indicated membership in the VFL. (*Sanchez*, *supra*, 63 Cal.4th at p. 677 [an expert is "allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang"].) Additionally, the jury heard from multiple witnesses that Tran was a member of the VFL. Indeed, Tran's attorney told the trial judge, while discussing evidentiary issues, that the defense was "not contesting that he's a VFL." Any *Sanchez* error specific to Tran's gang membership was harmless beyond a reasonable doubt.

Third, any *Sanchez* error related to the meaning of Tran's "forgive" tattoo was also harmless. On this point, Tran argues Nye's and Todd's reliance on Plata's statements in the jailhouse interview violated *Sanchez* and that this error was prejudicial as to the death judgment because it was used to demonstrate a lack of remorse. Tran argues that the prosecutor's "main theme" during the penalty phase closing arguments was that Tran "bragged about the crime and showed no remorse." Tran notes that defense counsel also "focused on remorse" and argued that the tattoos demonstrated that Tran was "really profoundly affected by" his crime.

At the outset, we recognize that some prejudice obviously arises when a gang expert testifies that a tattoo, literally translated as "Forgive," should instead be understood to mean "suck me" or "blow me." But any *Sanchez* error is harmless for two reasons. For one, the experts' opinion regarding the general meaning of the tattoo was supported by independently admissible evidence — namely, the experts' generalized knowledge of gang subculture, gleaned from conversations with gang members regarding the meaning of such tattoos. (*Sanchez*, *supra*, 63 Cal.4th at p. 677.) Additionally, while Tran is correct in observing that the prosecutor focused on rebutting Tran's

assertions of remorse during the penalty phase closing arguments, the prosecutor never mentioned the tattoos during the penalty phase.  Instead, the prosecutor focused exclusively on other evidence to demonstrate Tran's alleged lack of remorse. This evidence was substantial; it included Tran's repeated criminal actions and Tran's taped conversations with a jailhouse informant that suggested callousness about the murder.

On this record, we hold that any *Sanchez* error based on the experts' reliance on Plata's jailhouse statements regarding the meaning of Tran's tattoos was harmless.

## B.  Admission of Speculative Expert Testimony

In response to our request for supplemental briefing, which was limited to the Assembly Bill 333 and *Sanchez* issues, Tran also argues that reversal of the death judgment is warranted because the trial court failed to uphold its gatekeeping duty under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*).  Tran argues that the trial court should have excluded speculative gang expert testimony regarding Tran's and Plata's gang membership, the gang status of the VFL, and the fact that the charged offense was committed for the benefit of the VFL.

Tran has forfeited this claim.  A challenge to the admissibility of expert testimony under *Sargon* is a challenge to the reliability and foundation of the evidence, and whether the subject of the testimony is admissible as expert testimony.  (See *Sargon, supra*, 55 Cal.4th at pp. 771–772.)  These objections were available to Tran at the time of his trial, before we decided *Sargon*.  (See *People v. Gardeley* (1997) 14 Cal.4th 605, 617–619).  It is not evident that any objection on such grounds would have been " ' "futile or wholly unsupported by substantive law

then in existence." ' " (*People v. Perez* (2020) 9 Cal.5th 1, 8, quoting *People v. Brooks* (2017) 3 Cal.5th 1, 92.) Even if Tran were excused from raising a claim under sections 801 and 802 at trial because *Sargon* significantly developed the law, the original 2017 briefing in this appeal post-dates *Sargon* by five years. Tran had the opportunity to raise this *Sargon* concern then, and his failure to do so results in forfeiture. (Cal. Rules of Court, rule 8.520(d)(1) [supplemental brief must be "limited to new authorities, new legislation, or other matters that were not available in time to be included in the party's brief on the merits"]; *People v. Carrasco* (2014) 59 Cal.4th 924, 990 [finding forfeited claim first raised at oral argument and in subsequent supplemental reply brief].)

## C. Victim Impact Evidence

Tran argues that the trial court violated state and federal law by admitting certain evidence about the impact of Linda's death.

### 1. Facts

As noted, the prosecutor called Sunhwa, Janie, and Fox to testify at the penalty phase. Their testimony spanned about 35 pages of transcript, and while they testified, the prosecutor sometimes showed the jury photographs or videos of or about Linda, along with Linda's personal items.

#### a. Sunhwa Park

Sunhwa, Linda's father, testified about Linda as a child and as a teenager. As a child, Linda "received a lot of adoration and love from our family" because Sunhwa was the only one with two daughters. As a teenager, Sunhwa continued, Linda had many friends and attended church regularly. The prosecutor

showed Sunhwa photos of Linda, including one of her as a child in a "Korean traditional outfit."

Sunhwa also recounted the impact of Linda's death on her mother, Dong Park. Dong "came home and basically passed out" when she discovered what happened to Linda, Sunhwa recalled. Since then, Dong would "be in Linda's room crying every day." Dong suffered so much that Sunhwa thought that he could ease her pain "by letting her die or killing her." Sunhwa testified that he once entered Dong's room "to kill her with a knife," but his brother prevented him from doing so. Another time, Sunhwa poured gasoline around their home to set themselves on fire "so we [could] die" because Linda's death "was too much for us to bear, and we couldn't really go on living without her." But Janie, his eldest daughter, fetched their neighbors, the Foxes, and together they prevented him from doing so. Sunhwa also testified that Dong fainted when she was first meant to appear in court for this case and that she still visited and cleaned Linda's graveyard weekly.

Sunhwa also testified about the impact of Linda's death on himself. After she died, Sunhwa wrote on Linda's bedroom walls: "Linda, I love you. Linda, I miss you. Linda, I am so sorry." Sunhwa explained how he could not "live a day without drinking some alcohol in [his] system" after Linda's death and how he overcame his addictions "through faith" after realizing that he had to care for Janie.

b.     Marilyn Fox

Fox was the Parks' longtime next door neighbor when Linda died. Fox testified about the evening that Linda was killed. She explained how she followed Sunhwa to the Park

home and told him not to touch anything inside, returned to her home, and called the police.

Fox also testified about Linda herself. "She was a quiet girl and a very beautiful little girl," Fox recalled, observing that Linda "was always respectful" when Fox visited the Park home.

And Fox testified about how Linda's family underwent "a dramatic change" after her death. Fox testified about how Sunhwa would visit her home and "for probably about an hour he would just sit and talk with us, and then it would be — he would get the strength to go home to his house." This behavior "went on for a very long time, months," Fox remarked.

c. Janie Park

Janie, Linda's older sister, testified about Linda and how her death impacted their family and community. While Janie testified, the prosecutor showed her Linda's 1994 yearbook, three videos about Linda, and notes that Linda had written, among other things.

Janie recalled how Linda "would always follow me around" and how Linda "was incredibly close with my parents." Janie also testified about how Linda "would write little sticky post-it notes everywhere reminding herself that she had to do this for the next day, remind someone to do this." When the prosecutor showed Janie some of Linda's notes, Janie remarked that "normal people wouldn't write [this] kind of stuff down" but that "innocent people" would.

Janie then testified about how Linda's death affected her and the community. Janie explained how she took her son and daughter to visit Linda's grave and "pretty much explained that this is their aunt." The prosecutor then played two videos: one

of Linda's 14th birthday party and the other of her one-year anniversary memorial service.

Janie further testified about how Linda's death affected her parents. Janie testified that Sunhwa "became very self-destructive," remarked how "every time he went into the bathroom, he would scream, bang the walls," and opined that Sunhwa is "never, ever going to be the same." And Janie testified that watching Dong "just fall apart" "was very devastating" and recalled how Dong faints whenever she sees a police officer approach.

d.      Juror No. 1

After Sunhwa and Fox testified but before Janie took the stand, Juror No. 1 informed the trial court that she was unsure whether she could continue serving on the jury. The trial court then questioned Juror No. 1 in open court with counsel and Tran and Plata present.

Juror No. 1 said:  "I believe in the law, and I believe in being fair, and I believe that I have to be courageous enough to say I don't think I have an open mind anymore." After the trial court observed that an interpreter had cried during Sunhwa's testimony, Juror No. 1 replied, "I was shaking all night long. I will do, with all due respect, whatever you want. Out of fairness to everyone involved, everyone involved, I thought I owed it to all of you to be honest enough to say I'm not coping."

Because of this, defense counsel sought to excuse Juror No. 1, the prosecutor did not object to her excusal, and the trial court did not "have any problem excusing her." So the trial court excused Juror No. 1 and replaced her with another juror.

e.    Jury Instructions and Closing Argument

Later, the trial court instructed the penalty jury with CALCRIM Nos. 761 and 763, among other instructions. CALCRIM No. 761 tasked the jury with disregarding the instructions given during the guilt phase of the trial, following the instructions given during this phase of the trial, and deciding "whether each defendant will be sentenced to death or life in prison without the possibility of parole," among other things. It also said: "Do not allow bias, prejudice, or public opinion to influence your opinion in any way." And it said: "Words or phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." Defense counsel did not object to CALCRIM No. 761, nor did they request an additional instruction about how the jury should consider victim impact evidence.

CALCRIM No. 763 instructed the jury that "[u]nder the law, you must consider, weigh, and be guided by specific factors, some of which may be aggravating and some of which may be mitigating," and it then enumerated six factors to consider. Defense counsel objected to CALCRIM No. 763 on equal protection grounds, but the trial court overruled the objection. Defense counsel did not request an additional instruction on how the jury should consider victim impact evidence.

At penalty phase closing argument, the prosecutor remarked to the jury that the victim impact evidence felt like a "tidal wave." But this tidal wave, he continued, "becomes a drop in the ocean of what [the Parks] go through" and "what they live with every day." Defense counsel did not object to the prosecutor's penalty phase closing argument.

### 2. *Analysis*

" 'Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under [Penal Code] section 190.3, factor (a) as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair.' [Citation.] We have repeatedly held that ' "[a]dmission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive," ' is constitutionally permissible." (*People v. Steskal* (2021) 11 Cal.5th 332, 369 (*Steskal*).) "We review the trial court's admission of victim impact evidence for abuse of discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 138 (*Simon*).)

We have previously "upheld testimony by a physician, three law enforcement officers, and five family members who discussed the victim's 'childhood hardships, his lifelong desire to be a police officer, his achievements, his engagement and future plans, his death, his funeral service, and the aftereffects of his death.' " (*Steskal*, *supra*, 11 Cal.5th at p. 369, quoting *People v. Brady* (2010) 50 Cal.4th 547, 573.) We have also upheld testimony from a mother and an older sister of a murder victim and "a notebook containing 53 photographs taken throughout [the victim's] life, a report card, a group of letters, and a Christmas list [the victim] gave her mother shortly before the murder." (*People v. Winbush* (2017) 2 Cal.5th 402, 463 (*Winbush*).) And we have upheld testimony from seven people across about 73 pages along with four photographs of the murder victim. (*People v. Spencer* (2018) 5 Cal.5th 642, 676–680 (*Spencer*).)

Tran's claim is unavailing because this victim impact evidence was not unduly prejudicial. The witnesses properly described their relationships with Linda, how they learned about Linda's death, and how Linda's death impacted their lives. (See *Spencer*, *supra*, 5 Cal.5th at p. 676 ["Evidence relating to a murder victim's personal characteristics and the impact of the crime on the victim's family is relevant to show the victim's ' "uniqueness as an individual human being" ' and thereby 'the specific harm caused by the defendant.' "].) While Sunhwa and Janie testified, they were shown photos of Linda as a baby, child, or teenager, and personal items of hers, just like other victim impact witnesses have been shown photos or items of a victim in other cases. (See *Winbush*, *supra*, 2 Cal.5th at p. 462.) And neither the number of witnesses (three) nor the amount of testimony (about 35 pages) was excessive. (See *Spencer*, at pp. 676–680.)

Plus, the videos of Linda's birthday party, her graduation, and her one-year anniversary memorial service were not impermissible. Victim impact evidence presented via video may be relevant to the penalty determination, but " 'no bright-line rule pertaining to the admissibility of videotape recordings of the victim at capital sentencing hearings' " exists. (*People v. Bell* (2019) 7 Cal.5th 70, 128.) We have reviewed the videos, and they resemble other videotape evidence held permissible. All three videos resemble " 'home movie[s]' more than . . . professional production[s]." (*Ibid.*) They are " 'not enhanced by narration, background music, or visual techniques designed to generate emotion.' " (*Ibid.*) Nor do they " 'convey outrage or call for vengeance or sympathy.' " (*Ibid.*)

Nor does the victim-impact evidence invite a purely irrational response from the jury. "We have consistently

observed that the emotional trauma suffered by close friends and relatives is a permissible subject of victim impact testimony" and " '[e]motional testimony is not necessarily inflammatory.' " (*Winbush*, *supra*, 2 Cal.5th at p. 465.) Tran says the evidence was "devastating," seemingly pointing to Juror No. 1's distress and the interpreter's crying as proof, "but that is to be expected when loved ones have been brutally murdered." (*Simon*, *supra*, 1 Cal.5th at p. 140.) That the interpreter cried does not, by itself, require a conclusion that the evidence invites a purely irrational response. (Cf. *People v. Linton* (2013) 56 Cal.4th 1146, 1204 (*Linton*) ["That some jurors may have reacted to the testimony by crying does not require a conclusion that the evidence invited a purely irrational response by the jury in deciding the appropriate penalty or otherwise rendered defendant's trial fundamentally unfair."].)

Besides, Tran's argument relying on Juror No. 1's actions rests on the notion that Juror No. 1's reaction impliedly means that the remaining jurors were purely irrational. But we presume that jurors are impartial. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 482–485.) And Juror No. 1's actions signal something other than pure irrationality. Rather than remaining on the jury, Juror No. 1 reported that she could no longer keep an open mind, and defense counsel sought her excusal. In other words, Juror No. 1 acted just as we presume that a juror would act. So Juror No. 1's actions do not allow us to draw the negative inference against the jury that Tran would have us draw.

Tran's remaining arguments are unpersuasive. First, Tran argues that the pre-enactment history of section 190.3 means that the phrase "circumstances of the crime" excluded victim impact evidence absent a showing that a defendant

intended the specific harm caused by committing the crime, mainly relying on *People v. Love* (1960) 53 Cal.2d 843, or that this phrase only referred to evidence that was part of the crime itself, not victim impact evidence of the sort presented here, mainly relying on *People v. Nye* (1969) 71 Cal.2d 356 and *People v. Morse* (1969) 70 Cal.2d 711.

But we have rejected an almost identical argument founded on *Love* in *People v. Seumanu* (2015) 61 Cal.4th 1293. There, the defendant argued that we had not considered "the actual meaning of the statutory phrase 'circumstances of the crime'" in light of our "interpretation of the same phrase" in *Love*. (*Seumanu*, at p. 1366.) But *Love*, we explained, "did not purport to interpret the meaning of the statutory phrase in question to reach its decision," "has no bearing on the meaning of section 190.3, factor (a) as presently written," and "did not purport to give the phrase 'circumstances surrounding the crime'" — the phrase used in earlier statutes — "a narrow interpretation so as to preclude evidence of the crime's impact on surviving family and friends." (*Seumanu*, at pp. 1367–1368.)

Tran concedes as much but asserts that we have not considered the import of *Nye* and *Morse* here. Yet Tran's argument falters for a more fundamental reason: In *People v. Edwards* (1991) 54 Cal.3d 787, we held that evidence about "the impact of the murder on the victim's family" — in other words, the victim-impact evidence presented here — was admissible as "circumstances of the crime" under section 190.3 because the "usual, ordinary import" or the "commonly understood" meaning of the phrase "circumstances of the crime" encompassed such evidence. (*Edwards*, at pp. 833, 836.) In other words, our holding in *Edwards* rested on the unambiguous plain meaning of the phrase "circumstances of the crime." Generally, we

consult extrinsic sources, like a statute's history, to interpret a statute only when its language is ambiguous. (See *People v. Walker* (2002) 29 Cal.4th 577, 581.) By asking us to consider extrinsic sources that predated section 190.3, Tran thus implicitly asks us to read ambiguity into the phrase "circumstances of the crime." But we have long held that this phrase lacks any (see *Edwards*, at pp. 833–836), and we see no reason to reconsider our decision today.

Second, Tran asserts that the trial court should have instructed the jury to limit its consideration of victim-impact evidence "to a rational inquiry into the culpability of the defendant, not 'an emotional response to the evidence.' " But he concedes that we have rejected a similar argument before. At any rate, Tran's claim lacks merit. The penalty jury was instructed with CALCRIM Nos. 761 and 763, among others. CALCRIM instructions are "approved by the Judicial Council," are "the official instructions for use in the state of California," and are intended to "accurately state the law in a way that is understandable to the average juror." (Cal. Rules of Court, rule 2.1050(a); see also *Ramirez, supra*, 10 Cal.5th at p. 1008 & fn. 5.) Here, CALCRIM Nos. 761 and 763 are substantially identical for present purposes to their predecessors, CALJIC Nos. 8.84.1 and 8.85. (Compare CALCRIM No. 761 ["Do not allow bias, prejudice, or public opinion to influence your opinion in any way."] and CALCRIM No. 763 [enumerating aggravating and mitigating circumstances for jury to consider] with CALJIC No. 8.84.1 ["You must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings."] and CALJIC No. 8.85 [enumerating aggravating and mitigating circumstances for jury to consider like CALCRIM No. 763].)

In *Simon*, we held that CALJIC Nos. 8.84.1 and 8.85 are "sufficient to address a defendant's concerns about the proper use of victim impact evidence, and [are] consistent with his or her federal and state constitutional rights to due process, a fair trial, and a reliable penalty determination." (*Simon*, *supra*, 1 Cal.5th at p. 143.) In so holding, we rejected the argument that the trial court should have sua sponte instructed that penalty phase jury to limit its consideration of that victim impact evidence "to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence." (*Id.* at p. 142.) Like the *Simon* defendant's argument, Tran's argument is similarly unavailing.

Third, Tran argues that CALCRIM Nos. 761 and 763 fail to instruct the jury that its "pure emotional response to the evidence should not influence its decision at all" and that victim impact evidence is "a 'circumstance' of the crime." But CALCRIM No. 761 instructs the jury to not allow bias or prejudice to influence its opinion in any way, so to the extent that Tran asserts that a pure emotional response is an impermissible bias or prejudice, any instruction along the lines that Tran suggests "would not have provided the jurors with any information they did not otherwise learn" from CALCRIM No. 761. (*People v. Zamudio* (2008) 43 Cal.4th 327, 369.) And to the extent that Tran asserts that "a juror's 'emotional response' to the evidence may play no part in the decision to vote for the death penalty," he is mistaken: "[J]urors may, in considering the impact of a defendant's crimes, 'exercise sympathy for the defendant's murder victim[] and . . . [her] bereaved family members.'" (*Ibid.*)

In addition, CALCRIM No. 763 instructs the jury to "consider and weigh" the "circumstances" "shown by the

evidence." Victim impact evidence, as noted, is admissible as a "circumstance of the crime" under section 190.3 — as a matter of that phrase's plain meaning. Because CALCRIM No. 761 also instructed the jury to apply words or phrases not specifically defined in the instructions "using their ordinary, everyday meanings," we may infer that the jury understood that victim impact evidence was a circumstance of the crime, even if no instruction explicitly said as much. (Cf. *People v. Lewis* (2001) 25 Cal.4th 610, 669 [rejecting argument that "the various uses of the term 'circumstances' in the standard jury instructions at the penalty phase misled and confused the jury, in violation of the due process clause and other federal constitutional guarantees"].)

Fourth, Tran observes that the prosecutor took "full advantage" of the victim impact evidence at the penalty phase closing argument. To the extent that he wishes to challenge these remarks, he has forfeited it by failing to object to them below. (*People v. Huggins* (2006) 38 Cal.4th 175, 251–252.) In any event, "a prosecutor may rely upon the impact of the victim's death on his or her family. The prosecutor in the present case merely commented upon evidence we have determined was admissible, as he was entitled to do. [Citation.] Although the prosecutor's argument had emotional impact, it was permissible. We have acknowledged that emotion need not be eliminated from the penalty determination. Although emotion ' " 'must not reign over reason,' " ' it ' " ' "need not, indeed, cannot, be entirely excluded from the jury's moral assessment.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 787.)

Finally, Tran argues that his counsel was ineffective for failing to request a clarifying instruction limiting the use of victim impact evidence. But the penalty jury was properly

instructed, so Tran's counsel did not act unreasonably by failing to request a clarifying instruction. (See *People v. Benavides* (2005) 35 Cal.4th 69, 92–94.)

In sum, we conclude that the trial court did not abuse its discretion by allowing the jury to consider this victim impact evidence, nor did admitting this evidence render the trial fundamentally unfair to Tran or otherwise unconstitutional.

## D. Admission of Juvenile Criminal Offenses

Tran argues that the trial court violated the Eighth Amendment by admitting evidence of his juvenile offenses during the penalty phase.

### 1. Facts

As noted, the prosecutor called certain witnesses to testify about two residential burglaries committed in June 1992. At the time of both of these residential burglaries, Tran was 17 years old.

On June 24, 1992, David Schonder reported that jewelry, camera equipment, a telephone, and a video camera were missing from his home. Later, three latent fingerprints recovered from his home were identified as Tran's. Counsel then stipulated that Tran, on May 5, 1993, "admitted an allegation in a juvenile petition accusing him of committing a residential burglary on June 24, 1992 in connection with the Schonder residence."

On June 26, 1992, a California Highway Patrol officer detained Tran and David Du following a car accident. At an Orange County Sheriff's station, Tran told an officer that he and two others stole a television, a camcorder, about 150 quarters from a coin-filled jug, some fake jewelry, and a Nintendo video

game from a home belonging to David Nesthus the day before, on June 25, 1992. Tran also told the officer that he quickly became nervous after entering the home because he thought its inhabitants would return. One inhabitant, Jacqueline Nesthus, testified that she discovered a butcher knife lying in their bedroom closet that seemed to have been removed from a knife block in the kitchen. Counsel then stipulated that on November 30, 1992, "Tran admitted an allegation in a juvenile petition accusing him of committing a residential burglary on June 25, 1992 in connection with the Nesthus residence."

During his penalty phase closing argument, the prosecutor relied on this evidence in part to urge the jury to determine that the appropriate penalty for Tran was death.

### 2. *Analysis*

" 'Section 190.3, factor (b), permits the penalty phase jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." ' [Citations.] ' " 'Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows "conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute. . . ." ' " ' " [Citations.] Accordingly, 'although the fact of a juvenile adjudication is inadmissible as a factor in aggravation' because juvenile adjudications 'are not "prior felony convictions" within the meaning of section 190.3, factor (c),' such adjudications may be admissible under factor (b), which 'involves evidence of violent conduct other than the capital crimes, regardless of when the misconduct occurred or whether it led to a criminal

conviction.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 341–342 (*Rivera*).)

As an initial matter, the Attorney General concedes that no evidence showed that the Schonder burglary "involved the use or attempted use of force or violence or the express or implied threat to use force or violence," so "it appears that this burglary does not qualify as [section 190.3,] factor (b) evidence." But Tran neither objected to this evidence below nor raises this issue here. (*Partida, supra,* 37 Cal.4th at p. 434.) Even assuming that Tran did not forfeit a challenge to this evidence, its inclusion was harmless by any applicable standard in light of the other aggravating evidence against Tran. (See *People v. Williams* (2006) 40 Cal.4th 287, 316.)

Evidence of the Schonder burglary aside, the evidence concerning the Nesthus burglary is admissible under section 190.3, factor (b). "Residential burglary is entering a residence with the intent to steal or to commit any other felony. [Citations.] Force or violence against a person thus is not an essential element of residential burglary. However, a burglary perpetrated in a violent or threatening manner may be considered under section 190.3, factor (b)." (*People v. Cowan* (2010) 50 Cal.4th 401, 496.) Evidence of the Nesthus burglary was admissible under § 190.3, factor (b) because the jury could reasonably infer that Tran had employed force or violence during the burglary. (*Cowan,* at p. 497; see also *People v. Clair* (1992) 2 Cal.4th 629, 676–677 [holding evidence admissible under § 190.3 as criminal activity employing force or violence where defendant broke into a then-unoccupied apartment, was captured lying in the apartment occupant's bed, and had brought a butcher knife that was found in the bathroom].)

While conceding we have rejected the argument before, Tran argues that reliance on evidence of his juvenile criminal activity violated his rights under the Eighth and Fourteenth Amendments in light of the high court's decisions in *Roper v. Simmons* (2005) 543 U.S. 551, *Graham v. Florida* (2010) 560 U.S. 48, *Miller v. Alabama* (2012) 567 U.S. 460, and *Hall v. Florida* (2014) 572 U.S. 701.

" 'It is well established the federal Constitution does not bar consideration of unadjudicated criminal offenses.' [Citation.] '*Roper* does not compel exclusion of such evidence.' [Citation.] 'That case holds that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments. It says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile. An Eighth Amendment analysis hinges upon whether there is a national consensus in this country against a particular punishment. [Citations.] Defendant's challenge here is to the admissibility of evidence, not the imposition of punishment.' [Citation.] We have also observed that the same reasoning applies to *Miller v. Alabama* and *Graham v. Florida*. We concluded these cases 'do not address the question of whether evidence of juvenile misconduct can be considered on the question of what punishment a defendant may receive for crimes committed as an adult.' [Citation.] We also observed that the high court's more recent decision in *Hall v. Florida* was 'even further afield from this question' because the United States Supreme Court 'never suggested that evidence of juvenile misconduct may not be admitted in deciding the proper punishment for crimes an adult commits.' " (*Rivera, supra,* 7

Cal.5th at pp. 342–343.) We see no reason here to reconsider these decisions.

Apart from his *Roper*-based Eighth Amendment claim, Tran also argues that the Eighth Amendment's heightened reliability requirement in capital cases forbids courts from admitting juvenile convictions obtained without the right to a jury trial as evidence at the penalty phase of a capital trial. But there were no juvenile convictions introduced below; there were, however, two stipulations containing two admissions to allegations from separate juvenile petitions. This evidence, at least as to the Nesthus burglary, was admissible under section 190.3, factor (b), as Tran concedes. Moreover, Tran "waived his claim by his counsel's decision to enter the stipulation." (*People v. Gallego* (1990) 52 Cal.3d 115, 195.) And further still, we have held that evidence of juvenile misconduct admissible under section 190.3, factor (b) does not violate a defendant's "rights under the Eighth and Fourteenth Amendments to the federal Constitution to a reliable, nonarbitrary sentencing decision, to a sentence proportionate to his culpability, and to due process of law." (*People v. Lee* (2011) 51 Cal.4th 620, 648.)

In sum, we conclude that the trial court did not err by allowing the penalty jury to consider this evidence to determine the appropriate punishment for Tran.

## E. Denial of Allocution Request

Tran argues that the trial court violated his federal due process rights by denying him the opportunity to allocute without being cross-examined during the penalty phase of the trial, even though he recognizes that " 'we have repeatedly held there is no right of allocution at the penalty phase of a capital

trial.' " (*People v. Romero* (2008) 44 Cal.4th 386, 426, quoting *People v. Lucero* (2000) 23 Cal.4th 692, 717.)

" 'In legal parlance, the term "allocution" has traditionally meant the trial court's inquiry of a defendant as to whether there is any reason why judgment should not be pronounced. [Citations.] In recent years, however, the word "allocution" has often been used for a mitigating statement made by a defendant in response to the court's inquiry.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1057, fn. 39, quoting *People v. Evans* (2008) 44 Cal.4th 590, 592, fn. 2 (*Evans*).) The traditional understanding is embodied in section 1200. "Under that section, the trial court must ask a defendant, before imposing sentence, whether there is 'any legal cause to show why judgment should not be pronounced against him.' (§ 1200.)" (*Tully*, at p. 1057.)

Here, the trial court asked whether there was "any legal cause as to why [the] sentence should not be imposed" during its "automatic review of the jury's recommended sentence." Tran's counsel replied, "No." That satisfies section 1200. Tran thus appears to argue that he has a federal due process right to make a mitigating statement. In so arguing, Tran asks us to reconsider our decisions here in light of *Boardman v. Estelle* (9th Cir. 1992) 957 F.2d 1523 (*Boardman*).

We have already considered and rejected this *Boardman*-based invitation in *People v. Clark* (1993) 5 Cal.4th 950, 1036. The *Boardman* court held that the failure to allow a noncapital defendant who requests to address the court before sentencing is a denial of federal due process. (*Boardman, supra,* 957 F.2d at p. 1525.) But because a defendant during the sentencing phase of a capital trial " 'is allowed to present evidence as well as take the stand and address the sentencer,' " we have

discerned no constitutional " ' "right to address the sentencer without being subject to cross-examination" in capital cases.' " (*Clark*, at p. 1037, quoting *People v. Robbins* (1988) 45 Cal.3d 867, 889; see also *Evans*, *supra*, 44 Cal.4th at p. 600 [California statutory law "gives a criminal defendant the right at sentencing to make a *sworn* personal statement in mitigation that is *subject to cross-examination* by the prosecution. This affords the defendant a meaningful opportunity to be heard and thus does not violate any of defendant's rights under the federal Constitution."].)

In sum, we conclude that the trial court did not err by denying Tran the opportunity to allocute without being cross-examined during the penalty phase.

## F. Juror Misconduct

Tran argues that juror misconduct during the penalty phase requires reversal or remand. In particular, Tran claims that the trial court mistakenly denied his motion for a new trial founded on the penalty jury receiving extraneous information about the death penalty, which requires reversal; that the trial court's investigation to determine the extent of juror misconduct was inadequate, which requires remand; and that the trial court did not determine whether a previously undisclosed part of a juror's typewritten document evinces prejudicial juror misconduct, which also requires remand.

### 1. Facts

After the penalty jury returned its verdicts, a three-page typewritten document was found in the jury room in a folder containing the jury instructions. It was titled "Life, or Death?" and written by the penalty foreperson, Juror No. 7. The trial court described this document as "a thought-process thing" —

"nothing more than [Juror No. 7] putting down his thoughts" — but the court believed one paragraph merited inquiry. That paragraph said: "I cannot allow the fact that the American Bar Association has recently resumed its campaign for a national moratorium on the death penalty to influence my judgment in this case. Likewise, I cannot consider the fact that the U.S. Supreme Court has agreed to review a case challenging the legality of execution by lethal injunction as cruel and unusual punishment as I judge this case."

The trial court called Juror No. 7 into court, swore him in, and questioned him. Juror No. 7 admitted that he had written the typewritten document. It was "a written summary of my personal private deliberations in the case," Juror No. 7 said, explaining that expressing issues "that are very complex and also very important" in writing "enforces clarity of thought." He wrote it "toward the end of the trial" and brought it on the last day of deliberations so that he could "refer to it personally, privately," and leaving it behind "was absolutely accidental and unintentional." Juror No. 7 did not read any of it to his fellow jurors. Although the trial court allowed him to choose whether to share the typewritten document with counsel, Juror No. 7 preferred that it remained private.

Then, the trial court asked Juror No. 7 about the paragraph discussing the moratorium campaign and the high court news. Juror No. 7 explained that "the story about the Supreme Court's action broke" during the trial and that it was "the lead story in the Los Angeles Times that day," was "the top story on all the television news broadcasts," and was "all over the internet." This story "wasn't something I sought out" but "something I simply happened to see," he said.

Next, the trial court asked Juror No. 7 whether the jurors discussed the news about the moratorium campaign or the high court. Juror No. 7 said that another juror "brought the Supreme Court news item up," so he wrote about it in his document because he felt obliged, as the foreperson, "to make sure that if somebody else brought that up, that everyone was reminded that we could not allow that in any way to influence our deliberations." Juror No. 7 reiterated that he reminded "the other jurors that we could not allow either of those facts to affect our judgment in the case." Juror No. 7 also recalled that this "was not discussed again" after his reminder. Juror No. 7 also said that the discussion of the news article "was really very brief," thought that another male juror brought up the news article, and recalled that this male juror had mentioned that he had seen this article in a newspaper.

After this, the trial court excused Juror No. 7. "I have reviewed the document," the trial court told the juror before excusing him, "and it confirms my opinion that this is a recitation of your thought process. From what I've heard so far, I don't see anything that was improper, so rest easy. At this point there doesn't appear to be anything, to me, anyway, that is untoward at all."

Based on Juror No. 7's responses, Tran moved to access every juror's identifying information according to Code of Civil Procedure section 237. The prosecutor thought that soliciting information from the other male jurors would be helpful, so he suggested that the trial court summon and question them about the moratorium campaign and the high court news. Although the trial court did not "see enough to order jurors in," it agreed to notify all jurors and to hold a hearing according to Code of Civil Procedure section 237. The trial court's notice informed

jurors that they would be asked to discuss whether "their decision in the penalty phase of the trial was affected by discussions of matters that were not presented by way of evidence or the law upon which the jury was instructed" if they appeared at this hearing. It also informed jurors that they could personally appear at the hearing to protest the disclosure of their information, that they could contact the clerk to protest the disclosure of their information, or that they could notify the trial court of their desire not to be contacted by defense counsel.

About four months after the penalty jury determined that the appropriate sentence for Tran was death, the trial court held this hearing. Juror No. 2 believed that a moratorium on lethal injection was "brought up" as an aside but did not believe that it was "used as any part of the decision making." He also recalled that the "head juror said at the time that 'we are not supposed to consider that' " and that the entire discussion lasted about 15 seconds. He could not recall who mentioned the moratorium or whether anyone consulted any extraneous written material.

Juror No. 3 did not recall anyone saying anything about "any moratorium on lethal injections for executions." Nor could she remember whether the foreperson admonished them not to discuss the moratorium, whether anyone discussed the American Bar Association's (ABA) stance on the death penalty or the high court's decision to review a case involving a lethal-injection moratorium, or whether they received any extraneous information. Yet she thought that she herself had heard something about a moratorium on the death penalty. But she was unsure whether she heard about this while the jury deliberated; she said she did not think so because she "didn't watch a lot of T.V. or read newspapers or anything." Although

she did not object to her identifying information being disclosed to counsel, Juror No. 3 did not want her information disseminated any further.

Juror No. 7, who returned for this hearing, said much the same as he had before. He could not remember who mentioned the moratorium campaign but recalled that "when it came up," he "immediately said, 'We cannot allow that — any of that to influence our thinking.'" He thought that the moratorium campaign had been mentioned on the first day of deliberations, did not remember any other discussion of it, and reiterated that he did not show his "notes" to anyone else.

And Juror No. 9 did not recall any discussion about either a moratorium on lethal injections or the ABA's stance on the death penalty. Nor did she recall anyone bringing in paperwork that was not part of the evidence into deliberations. Yet she recalled "hearing something about the suspension of executions, not necessarily that it was lethal injection, but I don't recall if it was during — before or after the trial."

After these jurors were questioned, defense counsel moved the trial court to release the identifying information of the jurors who did not appear, but the trial court denied this motion, stating: "I can see nothing that's been presented to this court to lead this court to believe that there was anything improper rising to the level of juror misconduct. In fact, it sounds like things were handled appropriately." To investigate further, "I would have to disbelieve what these jurors have already told this court in the hope that throwing the line in the water would somehow grab some fish, and that is not the purpose of this proceeding," the trial court continued. Besides denying this request to investigate further, the trial court also declined to

disclose all of Juror No. 7's typewritten document, explaining that it "was completely his thought process." Tran unsuccessfully challenged the trial court's denial of his request for additional juror information before the Court of Appeal and before this court.

Tran then moved for a new trial on juror misconduct grounds. The trial court denied this motion at a hearing. "The issue of juror misconduct," the trial court said, "was considered. It was investigated, it was litigated. There was no juror misconduct. The court invited all jurors to discuss the issue. I believe, if I'm not mistaken, five — four chose to appear." Juror No. 7's typewritten document, it continued, "is merely a note to oneself as to the thought process of a juror in making a determination."

At Tran's request, we ordered unsealed all of Juror No. 7's typewritten document. Besides the aforementioned paragraph, this document stated in relevant part: "I must follow the law and the judge's instructions as they are given to me. [¶] . . . Simple but sound logic leads to the conclusion that no juror should project his or her personal religious value and moral code onto this case." It continued: "The defendants in this case do not fit my definition of 'penitent.' I think their remorse may be genuine, but the fact that they did not voluntarily submit themselves to the law and confess their crimes taints their remorse, and disqualifies them as truly penitent in my view. They may be sorry for killing Linda Park, but they are also sorry they were caught and convicted."

It also said: "I feel compelled to ask: Is forgiveness mine to give in the form of a jury vote and verdict? I am not the one who has been victimized. I must remember that while I may

consider the impact of the crime on the victim's family, I do not represent them as I judge. My duty is to be impartial and dispassionate." It went on: "These defendants are not illiterate or ignorant. Their moral compasses are not defective; they know what they did is terribly evil. The crime required sustained murderous intent. If either of them feels remorse, it may be genuine, but it is not pure and it is too little too late. Remorse merely signifies that your moral compass is working. Remorse is but the first step in true penitence. I am sure they are both sorry the police caught up with them; if they were truly penitent they would have turned themselves in, confessed, and attempted to make some kind of effort at restitution. I doubt they would have done so by now if the police had [*sic*] caught them. Mr. Ciulla stated in court that mercy was something freely given, without price. I believe otherwise; the price of mercy is genuine penitence, which consists of remorse, confession, forsaking, and restitution. Would the defendants still be free men today, keeping their secrets, if the police had not detected them?"

The document concluded: "Bottom line: neither of the defendants was raised in crushing poverty and/or a sociopathic family environment. No one forced them to join a street gang. They were old enough to know that criminal activity is morally wrong and can carry severe punishment. They entered the Park residence with criminal intent. While there, they improvised a murder weapon and used it to take the life of a completely innocent young girl in the sanctum of her own home for two reasons: to insure their financial benefit from the robbery, and to prevent her from identifying them after the robbery. From the start, their motives were entirely selfish. The crime they committed is repulsive in its motivation and heinous in its

execution. Their remorse for killing her may be genuine, but so is their remorse for being caught and convicted. Remorse alone is insufficient, in my opinion, to merit mercy. There are no mitigating circumstances in this case that even come close to counterbalancing the gravity of the defendants' actions."

### 2. *Analysis*

" 'A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.' [Citation.] 'Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias.' [Citation.] Even a juror's 'inadvertent receipt of information that had not been presented in court falls within the general category of "juror misconduct." ' " (*People v. Miles* (2020) 9 Cal.5th 513, 601 (*Miles*); see also § 1181.)

To determine whether juror misconduct involving jurors receiving information from extraneous sources is prejudicial, we review the entire record and set aside the judgment only if we conclude that a substantial likelihood of juror bias exists. (*Miles*, *supra*, 9 Cal.5th at p. 601.) " 'Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' " (*Ibid.*) " 'Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant.' " (*Ibid.*)

" 'We emphasize that before a unanimous verdict is set aside, the likelihood of bias under either test must be substantial.' [Citation.] 'Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is

to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' " (*Miles*, *supra*, 9 Cal.5th at pp. 601–602.)

"In reviewing the trial court's ruling, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination.' " (*Miles*, *supra*, 9 Cal.5th at p. 602.)

Although the Attorney General acknowledges the penalty jury receiving news of the moratorium campaign and the high court's decision to review the legality of execution via lethal injection likely constitutes juror misconduct and results in a presumption of prejudice, we need not decide whether that is so, for no substantial likelihood of juror bias exists here. This is because the extraneous material is not inherently prejudicial or substantially likely to have influenced the jury, nor is it substantially likely that jurors were actually biased against Tran.

Extraneous material is inherently prejudicial when its introduction at trial would have warranted reversal of the judgment. (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) Because Tran had already been found guilty by the time that the jury received this information, our inquiry focuses on whether the introduction of this information during the penalty phase would have warranted reversal of the penalty determination. (See *id.* at pp. 647–655.) Had this extraneous material been introduced at the penalty phase, it would not have warranted reversal of

the penalty determination because this extraneous material did not directly concern Tran's trial. *People v. Hardy* (1992) 2 Cal.4th 86 (*Hardy*) is instructive. There, we held nonprejudicial newspaper articles about " 'cases and jury selections' " — one of which discussed a particular trial of the judge that oversaw the defendants' trial, another of which quoted this judge commenting on court reform and displayed a photo of him, and the third of which neither quoted the judge nor referenced defendants' trial — that defendants alleged that 10 out of 12 jurors and every alternate juror had read, because these articles did not "contain[] accounts of defendants' trial" and "presented generalized arguments concerning the criminal justice system as a whole." (*Id.* at pp. 175, 176.)

The same is true here. There is no evidence that the news of the moratorium campaign or of the high court "contain[] accounts of defendants' trial." (*Hardy*, *supra*, 2 Cal.4th at p. 176; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 924 ["As the trial court found, on its face the [news article about a different, unrelated capital defendant] had absolutely nothing to do with defendant's case."].) There is no evidence that the moratorium campaign presented anything other than "generalized arguments concerning the criminal justice system as a whole." (*Hardy*, at p. 176.) Nor is there evidence that this extraneous information misled the jurors into thinking that responsibility for deciding how to punish Tran lay elsewhere. (See *Caldwell v. Mississippi* (1985) 472 U.S. 320, 330–341; *Romano v. Oklahoma* (1994) 512 U.S. 1, 10; *People v. Ledesma* (2006) 39 Cal.4th 641, 733 ["Caldwell simply requires that the jury not be misle[d] into believing that the responsibility for the sentencing decision lies elsewhere."].)

In addition, it is not substantially likely that the jurors were actually biased against Tran in light of "the nature of the misconduct and the surrounding circumstances." (*Miles*, *supra*, 9 Cal.5th at p. 601.) In this context, "actual bias" means " 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party' " and "may include a state of mind resulting from a juror's actually being influenced by extraneous information about a party." (*People v. Nesler* (1997) 16 Cal.4th 561, 581, quoting Code Civ. Proc., § 225, subd. (b)(1)(C).)

Here, it is not substantially likely that the jurors were actually biased against Tran considering how quickly and superficially the jurors discussed this extraneous material and how speedily Juror No. 7 admonished against discussing it further. The trial court found, and substantial evidence supports, that the discussion about the extraneous information lasted about 15 seconds, Juror No. 7 immediately admonished the jury against considering this information further, and no one discussed the information again after this admonishment. When a juror reminds his fellow jurors of the trial court's instruction and no evidence exists to question the reminder's effectiveness, the reminder is "strong evidence that prejudice does not exist." (*People v. Lavender* (2014) 60 Cal.4th 679, 687; see also *id*. at pp. 687–692.) Although Juror No. 3 and Juror No. 9 could not recall whether this discussion even happened, this lack of recollection is not inconsistent with a seconds-long discussion of a topic that was not discussed again.

In sum, because the jury received news that was not about Plata or Tran, discussed this news only for a brief period of about

15 seconds, were immediately admonished against considering it further, and did not do so, we conclude that no substantial likelihood of juror bias exists.

Alternatively, Tran claims that the trial court's inquiry into the moratorium campaign and the high court news was inadequate. According to Tran, further inquiry is needed to determine which juror mentioned this extraneous information during the penalty jury's deliberations, "along with any details of the exposure of the news stories to this juror and the remaining jurors." There is little reason, Tran asserts, for us to "believe that this unknown juror" — the juror who mentioned the extraneous information — "followed Juror [No.] 7's admonition to rely only on evidence presented in court."

But "the trial court acted well within its considerable discretion in deciding that no further inquiry was necessary" under these circumstances. (*Linton*, *supra*, 56 Cal.4th at p. 1214.) To allow Tran further investigation would require us "to disbelieve what these jurors" — Jurors No. 2, 3, 7, and 9 — "have already told [the trial] court in the hope that throwing the line in the water would somehow grab some fish." Because Tran "is not entitled to conduct a ' " 'fishing expedition' " ' for possible misconduct," we conclude that the trial court did not abuse its discretion by preventing him from embarking on one. (*Linton*, *supra*, 56 Cal.4th at p. 1214.)

Finally, Tran asserts that the undisclosed portion of Juror No. 7's typewritten document evinces misconduct beyond the claimed misconduct about the moratorium campaign and high court news, which requires remand to allow the trial court to investigate further. In particular, Tran argues that this undisclosed portion of Juror No. 7's typewritten document shows

that Juror No. 7 disregarded the trial court's instructions to consider only the evidence presented at trial, not to deliberate unless and until all 12 jurors are in the jury room, and not to draw any adverse inferences against Tran for his decision not to testify.

Tran agrees that the undisclosed portion of the document is inadmissible to prove that while the penalty jury deliberated, Juror No. 7 thought that Tran lacked remorse because he did not testify or confess to his crimes. Rather, Tran asserts that the undisclosed portion of the document is admissible to prove that Juror No. 7 "actually made the statements that Mr. Tran's silence and failure to confess evidenced a lack of remorse." In other words, Tran alleges that Juror No. 7 in fact said aloud during deliberations that he thought Tran's silence and failure to confess reflected a lack of remorse, thereby disregarding the trial court's instructions.

Tran's argument amounts to a request for the trial court to investigate whether Juror No. 7 said certain statements aloud based on the contents of the undisclosed portions of Juror No. 7's typewritten document. But a hearing to determine the truth or falsity of allegations of jury misconduct "should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.)

Even assuming that the undisclosed portion of Juror No. 7's typewritten document is admissible and that his alleged oral statement constitutes misconduct, the typewritten document does not demonstrate a strong possibility that Juror No. 7 actually said the alleged statement aloud. Nothing in the undisclosed portion of the typewritten document indicates that

Juror No. 7 did so. The trial court credited Juror No. 7's remarks that the typewritten document was for his personal, private reference; that he did not read any of it to his fellow jurors; and that leaving it behind was an accident and unintentional. On this record, we have no basis to infer from a document that Juror No. 7 intended to keep private that he said aloud the very things he wished to shield. Plus, given that Juror No. 7 mentioned the moratorium campaign and the high court news and cautioned himself against considering them, one might think the document would mention any improper statement that he uttered aloud, especially since Juror No. 7 did not expect others to view this document. But no such mention exists. Altogether, the undisclosed portion of the typewritten document does not demonstrate a strong possibility that Juror No. 7 in fact uttered this alleged statement.

In sum, we reject Tran's claim that the undisclosed portion of Juror No. 7's typewritten document requires remand.

### G. Death Penalty for Crimes Committed by a 20 Year Old

Tran was 20 years old when he committed these crimes, and he argues that imposing the death penalty on persons for crimes committed while they were 18 to 20 years old violates the state and federal Constitutions because it is cruel and unusual punishment and because a death sentence cannot be reliably imposed on such youthful offenders like Tran. In support of this claim, he cites *Roper* and related decisions.

We have recently rejected these arguments and decline to revisit them today. We have observed that "the high court in *Roper* recognized that the ' " 'qualities that distinguish juveniles from adults do not disappear when an individual turns 18,' " '

but nonetheless held that the ' " 'age of 18 is the point where society draws the line for many purposes between childhood and adulthood' " ' and is ' " "the age at which the line for death eligibility ought to rest.' " ' " (*Flores*, *supra*, 9 Cal.5th at p. 429, quoting *People v. Powell* (2018) 6 Cal.5th 136, 191, 192.) Nor are death sentences inherently unreliable "for those ages 18 to 21." (*Flores*, at p. 430.)

Tran "does point to various developments from the past few years, including a 2018 resolution from the American Bar Association House of Delegates urging the prohibition of the death penalty for those ages 21 and under (Res. No. 111 (Feb. 2018)); a nonprecedential opinion from a trial court in Kentucky declaring the death penalty unconstitutional for this same group (*Commonwealth v. Bredhold* (Ky.Cir.Ct., Aug. 1, 2017, No. 14-CR-161) 2017 WL 8792559); and the California Legislature's expansion of Penal Code section 3051, subdivision (a)(1), which provides 'youth offender parole hearing[s]' to inmates who were 25 or younger at the time of their commitment offense." (*Flores*, *supra*, 9 Cal.5th at p. 429.) But "these developments do not establish the 'national consensus' necessary to justify a categorical bar on the death penalty for individuals between the ages of 18 and 21 at the time of their offenses. [Citation.] Nor has defendant presented much in the way of new scientific evidence that might be relevant to the issue." (*Ibid*.)

## H. Miscellaneous Challenges to the Death Penalty

Tran presents many challenges to the constitutionality of California's death penalty scheme, while acknowledging that we have rejected them before. We decline to revisit the following precedent:

"Penal Code section 190.3, factor (i) (the age of the defendant) is not unconstitutionally vague." (*Rices, supra,* 4 Cal.5th at p. 94.)

"There is no federal constitutional requirement, either under the Fifth, Sixth, Eighth, or Fourteenth Amendments, that the jury make unanimous findings regarding the aggravating factors or the truth of the unadjudicated criminal activity admitted under section 190.3, factor (b)." (*Schultz, supra,* 10 Cal.5th at p. 683.)

"Allowing a jury that has convicted the defendant of first degree murder to decide if he has committed other criminal activity does not violate the right to an unbiased decision maker under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution." (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

"The trial court's instructions need not 'delete inapplicable sentencing factors, delineate between aggravating and mitigating circumstances, or specify a burden of proof either as to aggravation (except for other crimes evidence) or the penalty decision.' [Citation.] 'Nor are potentially mitigating factors unconstitutionally limited by the adjectives "extreme" and "substantial" . . . .' [Citation.] The sentencing factors are not vague and ill-defined." (*Suarez, supra,* 10 Cal.5th at p. 191.) Nor need the trial court "instruct the jury that life without parole was presumed the appropriate sentence; '[t]here is no requirement jurors be instructed there is a " ' "presumption of life" ' " or that they should presume life imprisonment without the possibility of parole is the appropriate sentence.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 589 (*Mitchell*).)

"The death penalty statute as construed by this court does not fail to perform the narrowing function required by the Eighth Amendment." (*Suarez, supra,* 10 Cal.5th at p. 190.)

"The federal constitution does not require intercase proportionality review among capital cases. [Citations.] 'California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently.' " (*Mitchell, supra,* 7 Cal.5th at pp. 589–590.)

"Consideration of the circumstances of the crime during the penalty phase pursuant to section 190.3, factor (a), does not result in an arbitrary and capricious application of the death penalty and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution." (*Mitchell, supra,* 7 Cal.5th at p. 587.)

"The jury need not make findings beyond a reasonable doubt that aggravating factors . . . outweighed the mitigating factors . . . ." (*Mitchell, supra,* 7 Cal.5th at p. 588.) This is so even after *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92. (*People v. Henriquez* (2017) 4 Cal.5th 1, 45.)

" 'California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of "evolving standards of decency." ' " (*Steskal, supra,* 11 Cal.5th at p. 380.)

## I.  Cumulative Error

Tran contends that the cumulative effect of errors at the guilt and penalty phases requires reversal.

We have either assumed or found error but concluded it was harmless regarding the jury instructions concerning Nguyen, Ly, and Plata (*ante*, pt. III.B.2), the failure to bifurcate in accordance with section 1109 (*ante*, pt. III.D), the admission of hearsay through gang expert testimony (*ante*, pt. IV.A.2), and the evidence of the Schonder burglary (*ante*, pt. IV.C.2). We strike Tran's gang enhancement but this does not require reversal of the guilt verdicts or death judgment. (See *People v. Scully* (2021) 11 Cal.5th 542, 556.) Considering the cumulative effect of these errors, we reach the same conclusion. And we have discerned no other basis for reversing Tran's convictions or sentence.

## CONCLUSION

We strike the gang enhancement and affirm the judgment in all other respects.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Tran

---

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S165998
**Date Filed:** August 29, 2022

---

**Court:**  Superior
**County:**  Orange
**Judge:**  William R. Froeberg

---

**Counsel:**

Catherine White, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Ronald S. Matthias and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Catherine White
Law Office of Catherine White, APC
4833 Santa Monica Avenue #70220
San Diego, CA 92107
(619) 980-3867

Christine Y. Friedman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9050